**Humphrey L. SHUFORD, et al., Plaintiffs,**

v.

**ALABAMA STATE BOARD OF EDUCATION, et al., Defendants.**

**Civ. A. No. 89–T–196–N.**

District Court of United States, M.D. Alabama, Northern Division.

Aug. 11, 1995.

Terry G. Davis, Amardo Wesley Pitters, Terry G. Davis, P.C., Montgomery, AL, Mark Englehart, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for plaintiff Humphrey L. Shuford.

James U. Blacksher, Birmingham, AL, Leslie Proll, Birmingham, AL, John C. Falkenberry, Sirote & Permutt, Birmingham, AL, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, for intervenor-plaintiff Connie Johnson.

James U. Blacksher, Birmingham, AL, Joe R. Whatley, Jr., Andrew Clay Allen, Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, Rebecca H. Hunt, Haskell, Slaughter, Young, Johnston & Gallion, Birmingham, AL, for intervenor-plaintiff Karen Newton.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, Montgomery, AL, for intervenor-plaintiff Kenneth A. Brackins.

Thomas T. Gallion, III, Haskell, Slaughter, Young, Johnston & Gallion, Montgomery, AL, Beverly Ann Poole Baker, Richard H. Walston, Rebecca H. Hunt, Michael K.K. Choy, Haskell, Slaughter, Young, Johnston & Gallion, Birmingham, AL, for intervenors-plaintiffs Myra P. Davis, Sheryl B. Threatt.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Willie Troy Massey, W. Troy Massey, P.C., Montgomery, AL, Solomon S. Seay, Jr., Montgomery, AL, Mark Englehart, Kenneth Lamar Thomas, Thomas, Means & Gillis, Montgomery, AL, for intervenors-plaintiffs Thad C. McClammy, Ella Jones.

Edward M. George, Jeffery A. Foshee, Foshee & Associates, Montgomery, AL, J. Mason Davis, Sirote & Permutt, Birmingham, AL, J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, R. Scott Clark, Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, AL, Renee Culverhouse, Office of General Counsel, State of Alabama, Department of Postsecondary Education, Montgomery, AL, for defendants Alabama State Board of Education, Fred Gainous, in His Capacity as Chancellor of Post Secondary Education Services, John M. Tyson, Jr., Individually and in His Official Capacity as a Member of the Alabama State Board of Education, Stedman Shealy, Jr., Individually and in His Official Capacity as a Member of the Alabama State Board of Education, Isabelle Thomasson, Individually and in Her Official Capacity as a Member of the Alabama State Board of Education, Ethel Hall, in Her Official Capacity as a Member of the Alabama State Board of Education, Willie Paul, in His Official Capacity as a Member of the Alabama State Board of Education, Spencer Bachus, Individually and in His Official Capacity as a Member of the Alabama State Board of Education, Victor Poole, Individually and in His Official Capacity as a Member of the Alabama State Board of Education, Evelyn S. Pratt, Individually and in Her Official Capacity as a Member of the Alabama State Board of Education and intervenors-defendants, Alabama State Board of Education, Fred Gainous, John M. Tyson, Jr., Stedman Shealy, Jr., Isabelle Thomasson, Ethel Hall, Willie Paul, Spencer Bachus, Victor Poole, Evelyn S. Pratt.

Randall C. Morgan, Terry Alan Sides, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, J. Mason Davis, Sirote & Permutt, Birmingham, AL, J. Allen Schreiber, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, for defendant Malcom A. Jones, in His Capacity as President of Atmore State Technical College and intervenors-defendants Larry McCoy, President of Muscle Shoals State Technical College, Northwest Shoals Community College, Atmore State Technical College, Betty Fine Collins, Tazewell Shepherd and Dan Cleckler, Individually and in Their Official Capacity as Members of Alabama State Board of Education, Bevill State Community College, Harold Wade, Individually and in His Capacity as Administrative Head of Northwest Alabama Community College, Hamilton Campus.

Jeffery A. Foshee, Foshee & Associates, Montgomery, AL, J. Mason Davis, Sirote & Permutt, Birmingham, AL, J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, for intervenors-defendants Lawson State Community College, Perry W. Ward.

Gerald Alan Templeton, Catherine L. Hogewood, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, R. Scott Clark, Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, AL, for intervenors-defendants Fob James, Bradley Byrne, G.J. Higginbotham, Stephanie Bell, David F. Byers, Jr., Sandra Ray, Mary Jane Caylor, in their Official Capacity as Members of Alabama State Board of Education, Earl Roberson, in His Capacity as Administrative Head of Trenholm State Technical College, Trenholm State Technical College.

James M. Parker, Jr., Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, AL,

Raymond P. Fitzpatrick, Jr., Whiteside & Fitzpatrick, Birmingham, AL, for intervenors-plaintiffs Jamie C. Moncrief, Thomas L. Davis.

## MEMORANDUM OPINION AND ORDER

MYRON H. THOMPSON, Chief Judge.

This lawsuit began when plaintiff Humphrey L. Shuford, an African–American, brought an employment discrimination claim charging that he had been denied promotions in Alabama's postsecondary educational system because of his race. He named as defendants the Alabama State Board of Education and its chancellor and individual board members and the Atmore State Technical College and its president. Shuford eventually became the class representative of all black citizens denied employment in or promotion to presidential, faculty, administrative, or supervisory positions in the postsecondary system. The Shuford class charged that the defendants had violated a number of federal civil rights laws.

Prior to approval of a partial consent decree resolving the race discrimination claims of the Shuford class, four women—Connie Johnson, Karen Newton, Myra P. Davis, and Sheryl B. Threatt—intervened as plaintiffs to raise claims of sex discrimination in employment in the postsecondary system on behalf of female professional educators. They brought claims against all of the Shuford defendants and added as defendants the Muscle Shoals State Technical College and its president, Lawson State Community College and its president, and Northwest Alabama Community College and its administrative heads. These plaintiffs charged that the defendants had violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17 (West 1994); Title IX of the Education Amendments of 1972, as amended, 20 U.S.C.A. § 1681(a) (West 1990); and the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983 (West 1994). Jurisdiction is proper under 28 U.S.C.A. §§ 1331, 1343(a)(4) (West 1993) and 42 U.S.C.A. § 2000e–5(f)(3) (West 1994).

The female plaintiffs and the defendants have submitted a proposed partial consent decree which would resolve sex- and race-based claims brought by white and black women against the postsecondary system. Two white men, Jamie C. Moncrief and Thomas L. Davis, intervened in this action to oppose the decree. After negotiations between the parties, Moncrief and Davis dropped their objections. This cause is now before the court on the female plaintiffs' and the defendants' joint motion for approval of the proposed partial consent decree. After reviewing the decree and after considering all comments for and against it, the court has concluded that the decree should be approved.

## I. BACKGROUND [1]

Alabama's postsecondary system is comprised of 33 junior, technical, and community colleges across the state. Junior colleges provide a general academic education, technical colleges provide an education in various trades, and community colleges combine both types of education. The Shuford class challenged as racially discriminatory the hiring and promotional practices of Alabama's postsecondary educational system for presidential, faculty, administrative, and supervisory positions.

The court granted motions to intervene by Johnson, a white female teacher and administrator in the public schools of Alabama, and Newton, a white female administrator at Northwest Alabama Community College. The parties to the proposed decree stipulated to the certification of a "class of all female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama

---

1. The background describes only those aspects of this lawsuit that are relevant to deciding if the consent decree regarding the women plaintiffs should be approved. A prior opinion sets forth the background for the claims of racial discrimination made by the Shuford class. *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511 (M.D.Ala.1994).

System of Postsecondary Education."[2] Schedule A positions are presidents, B positions are administrators and managers, C positions are non-faculty professionals, and D positions are faculty members. The court certified the class of women stipulated to by the parties, with Johnson and Newton as class representatives.

The class of women, like the Shuford class, claims that the cause of employment discrimination is that college presidents in the postsecondary system—the vast majority of whom have historically been white men—are given unbridled discretion in the hiring and promotion of personnel at their institutions. Vacancies at many institutions are not advertised, are left open for extended periods of time, and are filled on a purely subjective basis without reliance on any objective minimum qualifications. The class of women alleges that, as a result of the lack of uniform, reviewable employment standards at most institutions, discrimination against female professionals is widespread, resulting in the underrepresentation of female employees throughout schedules A, B, C, and D, particularly at the higher levels.

Davis and Threatt, two African–American female employees of Lawson State Community College, also intervened in this action. Davis and Threatt sought to represent an overlapping class of black female professionals employed in the postsecondary system. The parties to the proposed decree stipulated to the certification of a "sub-class of all black citizens represented by Humphrey Shuford and all women represented by Johnson and Newton, which is further and more specifically defined as a sub-class of all black female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama

System of Postsecondary Education."[3] The court certified that sub-class, with Davis and Threatt as class representatives. The sub-class makes essentially the same allegations regarding employment discrimination against black women resulting from unbridled presidential discretion as the female class makes for all women and the Shuford class made for all African–Americans.

The court approved a partial consent decree settling the claims of and affording relief to the Shuford class. *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511 (M.D.Ala.1994). A description of the major provisions of the decree follows. The Shuford decree requires that the Alabama State Board of Education adopt a non-discriminatory equal employment and promotion policy for the postsecondary system. The decree also sets numerical employment goals. The decree establishes as a goal that 25% of all college presidents (schedule A) shall be African–American by the end of fall quarter 1996. The decree divides the remaining covered positions into three categories: schedules B and C1, schedules C2 and C3, and schedule D. The decree sets a goal for each college that, by the end of fall quarter 1996, the percentage of black employees in each of the three categories be equal to at least the number which represents 75% of the percentage of blacks in the primary service area of the college. The decree further sets sequential goals for the percentage of blacks employed system-wide in each of the three categories: 21% by the end of fall quarter 1995, 23% by the end of fall quarter 1997, and 25% by the end of fall quarter 1999. The goals, however, are not to be construed as quotas. Additionally, the "decree shall not be construed to require the Defendants or any of the colleges to hire or promote any person, regardless of race, who is not qualified for the position in question, or to preclude them from hiring or promoting the best

---

**2.** The class was further defined as follows: "If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree."

**3.** The sub-class was further defined as follows: "If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff sub-class and the coverage of this decree."

qualified applicant regardless of race." *Id.* at 1535 (language of Shuford decree).

The Shuford decree also establishes a statewide bank of black applicants and requires the chancellor to employ various recruiting techniques to identify and attract qualified African–Americans. College presidents are required to obtain the names of all relevant applicants from the statewide bank when a vacancy arises, and all vacancies must be advertised. Each president must appoint one or more recruitment-and-selection committees—whose membership shall be at least 40% black—to review recruitment procedures and screen and recommend applicants, and the president must justify his or her decision in writing.

After approval of the Shuford decree, Johnson, Newton, Davis, and Threatt, together with the defendants, filed a joint motion to approve a proposed partial consent decree regarding their claims. The court tentatively approved this decree, known as the "Johnson decree," subject to notice and an opportunity for objections at a fairness hearing; approved the form of notice; and required the defendants to distribute the notice to all employees in the state postsecondary system employed in a position covered by the decree. Twenty-six white male employees submitted objections. The court held two fairness hearings at which it received documentary evidence and heard testimony from Johnson in support of the relief embodied in the decree.[4] The female plaintiffs and the defendants also provided a joint evidentiary submission in support of the decree.[5] Two of the objectors, Moncrief and Davis, intervened to challenge the sex-conscious provisions of the Johnson decree.[6] Moncrief

and Davis submitted evidence in opposition to the decree.[7]

After considering the decree, the court ordered the parties to respond to a number of concerns. In response, the sub-class of black women submitted further evidence.[8] Additionally, the female plaintiffs, the defendants, and Moncrief and Davis entered into a stipulation as to how the decree should be interpreted to ensure its legality.[9] As part of the stipulation, Moncrief and Davis dropped their objections to the Johnson decree.

The outline of the Johnson decree, which closely tracks the Shuford decree, is as follows. The Alabama State Board of Education must adopt a written policy for the postsecondary system declaring that "no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic" including race and sex, and that "all persons participating in selection procedures for professional employees shall take all action necessary to foster black persons and women, including black women, having equal and effective participation in the personnel decision-making process."

The decree sets a number of employment goals. There are two separate goals for the class of women. First, the decree treats schedule A separately from other positions and establishes as a goal that 25% of all college presidents shall be women by the end of fall quarter 1996, 33% by the end of fall quarter 1999, and 50% by the end of fall quarter 2005. Second, the decree sets as a goal that 50% of the people employed at each

4. The documentary evidence consists of Johnson Exhibits submitted at the July 28, 1994 fairness hearing.

5. This evidence was submitted in two parts: Joint Submission of Evidence filed on June 10, 1994 and Joint Submission of Supplemental Evidence filed on August 29, 1994.

6. The court withheld ruling on allowing Moncrief and Davis to intervene to challenge the race-conscious provisions of the Johnson decree, pending a determination of their standing to

challenge these provisions. Because Moncrief and Davis have dropped their objections, the court finds it unnecessary to determine whether they have standing.

7. Evidentiary Submission of Moncrief and Davis filed on August 26, 1994.

8. Declaration of Dr. Michele Wilson filed on May 31, 1995.

9. Stipulation of the parties filed on May 26, 1995.

college on each of schedules B, C1, C2, C3, and D shall be women by the end of fall quarter 2005. The decree also sets goals for the sub-class of black women that correspond to half of the goals approved for all African–Americans in the Shuford decree. The goal for schedule A is that 12.5% of all college presidents be black women by the end of fall quarter 1996. The decree sets two types of goals for three categories of remaining covered positions: schedules B and C1, schedules C2 and C3, and schedule D. First, the decree sets a goal for each college that, by the end of fall quarter 1996, the percentage of African–American women employees in each of the three categories be 37.5% of the percentage of blacks in the primary service area of each college. Second, the decree sets sequential goals for the percentage of black women employed systemwide in each of the three categories of positions: 10.5% by the end of fall quarter 1995, 11.5% by the end of fall quarter 1997, and 12.5% by the end of fall quarter 1999. The goals for African–American women follow the Shuford decree in addressing both the institutions and the system as a whole because, without targets for each institution, historically black institutions would "round-up" the system-wide average allowing historically white institutions to ignore the race discrimination problem.

According to two of the stipulations reached by the parties, the court interprets the Johnson decree as follows:

"1. The Johnson Decree requires only that women, including black women, receive equal and non-discriminatory treatment by the Defendants in making employment decisions. The Johnson Decree does not require or permit any preferences for women, including black women, in the decision-making process.

"2. In considering qualified persons for vacancies, the Defendants shall use valid job-related selection procedures, and all candidates should be fully considered and evaluated. No jobs should be set aside or reserved on the basis of race or gender. The Johnson Decree should not be interpreted as requiring or as permitting the hiring or promotion of less qualified persons on account of their gender or race in order to meet the goals of the Johnson Decree." [10]

These stipulations will be examined in depth later in order to determine whether the decree is legal. For now, it is enough to note that the goals are not to be construed as quotas or set-asides. The non-attainment or over-attainment of any of them is not a per se violation of the decree, and the court can modify the goals. Further, the decree does not require or permit any college to hire or promote a woman, black or white, who is less qualified for the position in question in order to meet the goals. Women are not even permitted preferences under the decree. Finally, the decree does not require that any current employee be terminated or adversely affected in his or her employment for the sake of achieving the goals.

The Johnson decree extends to black and white women the recruitment procedures of the Shuford decree. The statewide bank of African–American applicants created by the Shuford decree will be expanded to include female applicants. The chancellor is required to employ various recruiting techniques to identify and attract qualified women as well as blacks. College presidents must obtain the names of all relevant female applicants and black applicants from the statewide bank when a vacancy arises. The provision of the Shuford decree requiring that each college president appoint one or more recruitment-and-selection committees for the purpose of reviewing recruitment procedures and screening and recommending applicants is modified to require that the membership not only be at least 40% African–American but be at least 50% female.

The process for filling vacancies is governed by the Shuford decree and reaffirmed in the Johnson decree. All vacancies must be advertised. Written job descriptions, containing objective selection criteria, are required. A written evaluation must be prepared for each applicant, and all applicants with the relevant objective qualifications must be invited for an interview by a selec-

10. *Id.*

tion committee.[11] The committee must recommend three applicants to the college president, who must choose from the three and justify the decision in writing. A president may reopen the application and selection process if he or she deems it necessary to comply with the objectives of the decree. Under the terms of the proposed decree, the court will retain jurisdiction over systemic relief in the decree until the end of the year 2005.

Other provisions in the Shuford and Johnson decrees require college presidents to follow certain procedures when making lateral transfers, hiring temporary employees, and making layoffs to ensure that such practices are not used to thwart the goals of the decrees. The decrees also require detailed reporting for monitoring purposes.

The proposed decree includes individual relief for Johnson, who will receive $45,000 in compensatory damages. The decree will also dismiss, with prejudice, Johnson's individual claims against the defendants. The decree allows Newton, Davis, and Threatt to have their individual claims heard separately.[12] The decree also dismisses the individual defendants in their individual capacities.

## II. STANDARDS FOR REVIEW OF CONSENT DECREES

■■■ It is well established that voluntary settlement is the preferred means of resolving class-action employment discrimination lawsuits. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978),[13] *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is equally well established, however, that the settlement process is susceptible to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is fair, adequate, and reasonable. *Piambino v. Bailey*, 757

F.2d 1112, 1139 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway*, 576 F.2d at 1169. For example, the interests of the class lawyer and the class may diverge, or some members of the class may wrongfully compromise or "sell-out" the interests of other members. *Pettway*, 576 F.2d at 1169. As part of determining fairness, adequacy, and reasonableness, the court must ensure that the settlement is not collusive. *Piambino*, 757 F.2d at 1139. Finally, the court has the duty of ensuring that the settlement is not illegal or against public policy. *United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980); *Harris v. Graddick*, 615 F.Supp. 239, 241–42 (M.D.Ala.1985).

■■■ Before resolving these concerns, the court must ensure that all interested parties were informed of the settlement and had the opportunity to voice their objections. Rule 23(e) of the Federal Rules of Civil Procedure requires that class members be notified of the settlement. Further, the Civil Rights Act of 1991 precludes challenges to a consent judgment resolving employment discrimination claims from those non-class members who had actual notice of the proposed decree and a reasonable opportunity to present objections. 42 U.S.C.A. § 2000e-2(n)(1)(B) (West 1994).

In this case, court-approved notices were distributed individually to all present employees, both class and non-class members, of the 33 institutions in the postsecondary system who occupy positions covered by the decree. Notices were also posted in conspicuous places at each institution and addressed to all employees and to all blacks and women who are, have been, or may become candidates for employment in or promotion to the covered positions.[14] The notices described the decree, advised recipients that their employment and promotion opportunities might be

---

**11.** In the event 10 or more applicants are qualified, the president and the committee can screen applicants.

**12.** These claims were referred to a United States Magistrate Judge.

**13.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit

Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**14.** Documentation of compliance with the notice requirements was presented at the fairness hearings.

affected, and included specific information about how to present objections in writing and at the fairness hearings. The court held a fairness hearing on June 22, 1994, and a supplemental fairness hearing on July 28, 1994, to seek the views of both class and non-class members.[15]

The notice was adequate to inform all interested parties about the provisions of the decree. The notice also adequately informed non-class member employees that the decree might adversely affect their interests. The fairness hearings and opportunity for written objections were adequate to solicit and determine the views of class members and non-class member employees. In sum, the notice and fairness hearings were sufficient under both Rule 23(e) and the Civil Rights Act of 1991.[16]

### III. WHETHER THE DECREE IS FAIR, ADEQUATE, AND REASONABLE

■ The court recently set out factors it may examine in deciding whether a settlement is fair, adequate, and reasonable. *White v. State of Alabama*, 867 F.Supp. 1519, 1533 (M.D.Ala.1994). These factors are as follows: (1) the views of the class members; (2) the views of class counsel; (3) the sub-

stance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the stage of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense, and likely duration of the lawsuit; and (8) the range of possible recovery. *See Leverso v. South-Trust Bank of Alabama, Nat. Assoc.*, 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

### A. *Views of Class Members*

■ In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. *White*, 867 F.Supp. at 1533; *Shuford*, 846 F.Supp. at 1517. Johnson testified at the fairness hearing that she had heard no objections to the decree from women or men.[17] The court also received testimony in support of the decree in the form of affidavits and depositions.[18] Of the large number of class and sub-class members who received notice, none made an objection known to the court. The court concludes, therefore, that the class and sub-class are overwhelmingly in support of the proposed partial decree. *See White*, 867 F.Supp. at 1534; *Shuford*, 846 F.Supp. at 1517; *cf. Reynolds v. King*, 790 F.Supp. 1101, 1109

---

15. Three of the 33 institutions—Ayers State Technical College, Patterson State Technical College, and Wallace State Community College (Dothan)—received the notices too late to give their employees sufficient time to file objections before the first fairness hearing. A revised notice was sent to these institutions and sufficient time was allotted for objections to be filed. The supplemental fairness hearing was held to seek their views.

16. As a corollary to the requirements of § 2000e–2(n)(1)(B), the court has provided each of the objectors and counsel for Moncrief and Davis with a copy of this order.

17. Transcript of June 22, 1994 hearing on consent decree at 30.

18. Betty Best Batson Aff. *in* Joint Submission of Evidence, Exhibit 4, ¶¶ 11–17 (white female); Joan Bolden Aff. *in* Joint Submission of Evidence, Exhibit 8, ¶¶ 6–12 (black female); Dr. Gladys King Burns Aff. *in* Joint Submission of Evidence, Exhibit 17, ¶¶ 10–16; Shirley Bush Aff. *in* Joint Submission of Evidence, Exhibit 18, ¶¶ 10–17; Myra P. Davis Dep. *in* Joint Submis-

sion of Evidence, Exhibit 32 at 140–42 (black female); Dr. Sylvia Gist Aff. *in* Joint Submission of Evidence, Exhibit 33, ¶¶ 13–20 (black female); Mary Joe Kelley Hayes Aff. *in* Joint Submission of Evidence, Exhibit 34, ¶¶ 11–18 (black female); Dr. Joanne Jordan Aff. *in* Joint Submission of Evidence, Exhibit 39, ¶¶ 5–12 (white female); Dr. Judy Miller Aff. *in* Joint Submission of Evidence, Exhibit 40, ¶¶ 6–12; Cindy Mixon Aff. *in* Joint Submission of Evidence, Exhibit 41, ¶¶ 8–15; Dr. Deloris Mae Meyer Aff. *in* Joint Submission of Evidence, Exhibit 45, ¶¶ 18–24; Dr. Susan Parker Aff. *in* Joint Submission of Evidence, Exhibit 48, ¶¶ 10–17 (white female); Sheryl Threatt Dep. *in* Joint Submission of Evidence, Exhibit 60 at 81 (black female); Glenda Y. Williams Aff. filed on June 17, 1994, ¶¶ 8–14 (black female); Shearlene Hall Aff. filed on June 17, 1994, ¶¶ 8–14 (black female); Eva Carter Aff. filed on June 17, 1994, ¶¶ 9–16 (black female); Edith W. Byrd Aff. filed on June 17, 1994, ¶¶ 8–14 (black female); Brenda Barham Aff. filed on June 17, 1994, ¶¶ 10–17 (black female); Barbara J. Greene Aff. filed on June 17, 1994, ¶¶ 7–13 (black female); Janice Williams Aff. filed on June 17, 1994, ¶¶ 10–17 (black female); Janice Orange Aff. filed on June 17, 1994, ¶¶ 10–17 (black female).

(M.D.Ala.1990) (majority's silence may be, but is not always, indicative of classwide support).

■ Particularly because there have been no objections filed by class or sub-class members, the court has no reason to suspect that the proposed decree treats any portion of the class or sub-class unfairly. *See White,* 867 F.Supp. at 1534; *Shuford,* 846 F.Supp. at 1519 & n. 16. There appears to be no overt conflict within the class or sub-class. Although the proposed decree provides monetary damages only to Johnson, it does not preclude or in any way limit suits by other individuals for damages against the defendants. The overall impact of the proposed decree will be systemic relief in each of the professional job classes and at each institution. When a "settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement 'may appropriately be described as an intrinsically "class" decision in which majority sentiments should be given *great weight.*'" *Paradise v. Wells,* 686 F.Supp. 1442, 1445 (M.D.Ala.1988) (quoting *Pettway,* 576 F.2d at 1217). The great weight accorded majority opinion in this instance favors approving the decree.

### B. *Views of Class Counsel*

■ The judgment of class counsel is also important in addressing the fairness, adequacy, and reasonableness of a consent decree. *Pettway,* 576 F.2d at 1215. Counsel for the female plaintiffs include a number of prominent and respected civil rights attorneys. They argue that the decree is fair, adequate, and reasonable, and the court respects their views.

### C. *Substance and Amount of Opposition to the Decree*

White male employees of the postsecondary system submitted 26 essentially identical written objections. The objectors claimed that the settlement would hinder their job opportunities, proposed excessive goals, and

would unfairly favor blacks and women. After intervening, Moncrief and Davis raised additional objections which are, in summary form, as follows: (1) the decree permits the defendants to favor blacks and women without regard to relative qualifications, (2) the decree's goals effectively require quotas, (3) the goals are not sufficiently based on government interests and are not sufficiently related to those interests, (4) the goals are not precise enough, (5) white males are unnecessarily burdened, (6) the goals act to maintain rather than achieve a balanced workforce, (7) the selection procedure and reduction-in-force provisions unfairly provide preferences for blacks and women, (8) the requirement that the recruitment-and-selection committees include a certain percentage of blacks and women is illegal, and (9) the defendants should be required to undertake systemwide reform.

Most of the objections pertain to the legality of the decree, which the court addresses in a later section. The only objection pertaining to fairness, adequacy, or reasonableness is that the decree inadequately reforms the postsecondary system's employment practices. Because Moncrief and Davis have since dropped this objection and the other objectors do not raise it, the court does not need to address the question.

### D. *Existence of Collusion*

■ There has been no charge that the decree was a product of collusion between the parties. There is no evidence that counsel or the named plaintiffs benefit from the decree at the expense of members of the class or sub-class. Although Johnson is afforded individual monetary relief, this does not adversely affect the rights of the class or sub-class. Further, there is no evidence that the parties' negotiations were anything other than arms-length.

### E. *Other Factors*

■ The remaining four factors are interrelated: the stage of the proceedings; the likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery. This

litigation has been ongoing for a number of years. The parties have had ample opportunity to evaluate the strengths and weaknesses of their respective positions. They have also had the benefit of the court's views on the closely-related Shuford decree. The issues presented are complex and would have required a contentious trial. The determination of the parties to settle on relief comparable to that afforded by the Shuford decree was reasonable.

■ In light of the above considerations, the court has independently evaluated the fairness, adequacy, and reasonableness of the proposed settlement. "A settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Paradise,* 686 F.Supp. at 1446. As a result, the question is not "whether the proposed consent decree is the best deal possible," but whether it is "at a minimum, fair, adequate, and reasonable." *Id.* at 1448.

The decree should be a significant benefit to class members. It forbids discrimination and establishes standardized application and selection procedures to ensure that all applicants are considered on the basis of their qualifications. Under the terms of the decree, membership on recruitment-and-selection committees at each institution will be at least 40% African–American and 50% female. This requirement ensures that blacks and women will be involved in the decision-making process. The decree requires recruitment of qualified African–Americans and women so that they will be well-represented in the applicant pool. Furthermore, presidents must justify their employment decisions by written explanation. The decree seeks to be exhaustive in closing possible loopholes to the effective implementation of the employment goals by specifically addressing the areas of temporary hiring, transfers, mergers, and consolidations. These provisions will ensure that the decree is not undermined by the abuse of certain "secondary" employment practices such as transfers and the use of temporary workers. Finally, safeguards for fair treatment of all candidates are present throughout the process, ending with periodic review by the parties and the court. Based on the above considerations, the proposed partial consent decree is fair, adequate, and reasonable.

## IV. WHETHER THE DECREE IS LEGAL AND GOOD PUBLIC POLICY

■ The court must also address whether the proposed partial consent decree is legal. Because the decree involves affirmative action undertaken by a public employer, it must be analyzed under both Title VII of the Civil Rights Act of 1964 and the equal protection clause of the fourteenth amendment to the United States Constitution. *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1536 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1695, 131 L.Ed.2d 558 (1995). A consent decree is subject to the same analysis as a voluntary affirmative action plan. *Id.* at 1534.

■ Because the equal protection clause requires different levels of scrutiny for race and sex, the court will analyze the provisions regarding black women separately from the provisions affecting all women. Under the equal protection clause, the court must apply strict scrutiny to the race-conscious relief in the decree. *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 498–508, 109 S.Ct. 706, 724–30, 102 L.Ed.2d 854 (1989) (majority opinion applies strict scrutiny); *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d at 1544. Sex-conscious relief, however, is subject to intermediate scrutiny. *Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1579–80 (11th Cir.1994). Both the sex- and race-based provisions are also subject to analysis under Title VII.[19] The standards

---

19. Title VII provides, in relevant part:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privi-

for affirmative action under Title VII and the equal protection clause are somewhat different. *Johnson v. Transportation Agency,* 480 U.S. 616, 627 n. 6, 632, 107 S.Ct. 1442, 1449 n. 6, 1452, 94 L.Ed.2d 615 (1987). The differing standards will be addressed for both sex and race.

The court begins by addressing the sex-conscious provisions of the decree. This examination is split into two parts. The first presents a new method of looking at affirmative action that is appropriate to this decree. The second performs a traditional analysis. After these two parts, the court turns to the race-conscious provisions of the decree.

A. *Legality of Sex–Conscious Provisions Based on the Distinction Between Affirmative Action Used for Inclusion and Exclusion*

The words "affirmative action" have in recent times taken on a monolithic negative connotation. This is unfortunate for at least two reasons. First, much affirmative action has been helpful in rectifying a long history, which is not yet over, of discrimination in this country. This reason attacks the negative connotation head on by arguing for the utility of affirmative action. Second, there exists a wide variety of affirmative action techniques, with different consequences, each of which should be analyzed on its own merits. Obscuring the differences among varying types of affirmative action has made deciding when they are justified difficult. Although affirmative action's utility is the more important of the two reasons from a policy perspective, it is not the court's focus in this opinion. The current public debate will hopefully allow all interested parties to discuss the utility

of affirmative action. The court instead will focus on the differences among various affirmative action methods, distinctions that the public debate has often missed and that frequently escape direct judicial recognition as well.

■ There are two basic ways to approach affirmative action: through inclusion or exclusion. Inclusive affirmative action techniques have as their purpose ensuring that the pool of candidates is as large as possible. For example, the primary inclusive form of affirmative action is recruitment, which generally attempts to expand the applicant pool to include more women or minorities. Recruitment and other techniques of inclusion do not affect the selection process for hiring or promotion. Rather, inclusive techniques seek to ensure that as many qualified candidates as possible make it to the selection process. In contrast, affirmative action through exclusion usually works to select some candidates rather than others from a pool.[20] Such techniques include setting selection goals for vacancies, requiring selection quotas for vacancies, and displacing workers of a particular sex or race through layoffs. These affirmative action techniques, to varying degrees, have the potential to help minorities and women actually be selected at the expense of someone else. Of course, selection by necessity requires excluding some people. The concern is discriminatory exclusion that causes harm to third parties, as these examples suggest.

■ The court is unaware of prior decisions focusing on the difference between inclusion and exclusion as the deciding principle in this context.[21] Perhaps this is be-

leges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C.A. § 2000e–2(a) (West 1994).

20. It is also possible to shrink the applicant pool through techniques of exclusion, but this is not the usual practice.

21. The court is addressing whether anyone is excluded, not the different question of whether women or minorities are being excluded or included. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 316–17, 106 S.Ct. 1842, 1869, 90 L.Ed.2d 260 (1986) (Stevens, J., dissenting). The distinction between inclusion and exclusion of women and minorities is relevant primarily to the question of whether discrimination is harmful to women or minorities, which is one way of determining whether affirmative action is justified. The court does not address that issue here, but instead focuses on whether affirmative action is harmful to or excludes anybody, particularly whites and males.

cause, unlike this case, affirmative action decisions primarily if not solely concern techniques of exclusion. The distinction between inclusion and exclusion, however, arises from the accepted doctrine that, as part of an inquiry into legality, courts must examine the consequences of affirmative action on third parties. *See, e.g., United States v. Paradise,* 480 U.S. 149, 171, 182–83, 107 S.Ct. 1053, 1066, 1072–73, 94 L.Ed.2d 203 (1987) (plurality opinion); *id.* at 197, 107 S.Ct. at 1080 (O'Connor, J., dissenting); *Seibels,* 31 F.3d at 1576, 1577; *Shuford,* 846 F.Supp. at 1531. Inclusive techniques impose no or slight adverse effects on third parties and are easier to justify than exclusion, which has significant potential to cause adverse consequences. *See Shuford,* 846 F.Supp. at 1531 (comparing almost burdenless recruitment procedures to greater burden of selection goals). Even within the category of exclusion, techniques that have greater adverse effects are harder to justify. *See Paradise,* 480 U.S. at 182–83, 107 S.Ct. at 1072 (comparing disruption of layoffs to more diffuse burden of promotion quotas).

 The power of the distinction between inclusion and exclusion as an analytical tool is apparent throughout the examination of the sex-conscious provisions of the Johnson decree. At the heart of the distinction is the recognition that, as the Supreme Court put it: "Qualified white candidates simply have to compete with qualified black candidates." *Id.* at 183, 107 S.Ct. at 1073. Including more qualified candidates in the pool is, as seems obvious and as will be discussed below, both proper and desirable. Therefore, techniques of inclusion do not require the traditional Title VII and equal protection analysis that courts have used for techniques of exclusion.

The court now turns to the Johnson decree to see which of its provisions have the potential to be illegal. In practice, this means identifying the sex-conscious provisions of the decree. Just because a provision takes sex into account does not make it illegal.

The nature of each of the sex-conscious provisions must be looked at to determine legality.[22] The following five provisions that take sex into account must be examined.[23]

### 1. Non–Discrimination on the Basis of Sex

 The decree provides for a policy of non-discrimination on the basis of sex. The establishment of this policy requires taking into account discrimination on the basis of sex. The policy is therefore sex-conscious, but cannot be illegal because it fulfills the mandate of the equal protection clause. The non-discrimination provision illustrates that taking sex into account is not always illegal. In fact, because non-discrimination on the basis of sex is required by law, the failure to take sex into account to insure non-discrimination can be illegal. This should not be surprising because non-discrimination is the foundation of inclusion, while discrimination is a basis of exclusion.

### 2. Sex–Based Employment Statistics

 The decree provides for yearly reporting requirements designed to keep track of the number of women employed by the postsecondary system. Using sex as a relevant factor in compiling employment statistics does not cause harm because there is no exclusion. Although the tracking provisions are sex-conscious, they merely recognize sex discrimination rather than perpetuate it. There is nothing improper about taking sex into account as a diagnostic tool in an attempt to ascertain whether women are being discriminated against. The failure to take sex into account can result in the failure to recognize sex discrimination. The measures taken to remedy such discrimination could be illegal, but the attempt to ascertain whether there is a problem and whether progress is being made should be encouraged.

---

**22.** Although the court is here concerned only with sex-conscious relief, the following analysis also applies to similar race-conscious remedies.

**23.** There are other provisions in the decree such as those with regard to lateral transfers and

layoffs that are also sex-conscious. These provisions, however, are covered by the general categories discussed by the court below and therefore do not need independent analysis.

### 3. *Expanding the Pool of Women*

 The decree incorporates procedures designed to recruit qualified women. Relatedly, the decree allows college presidents to reopen the application and selection process to meet the decree's remedial objectives. Reopening the process to include more women, like recruiting, expands the pool of applicants and increases competition. The purpose of both of these provisions is to increase the number of applicants considered in order to obtain the best candidates. The provisions are not aimed at the actual selection process. The crucial distinction is between expanding the applicant pool and actually selecting from that pool. Expanding the pool is an inclusive act. No one can rightly complain because he has been passed over for a more qualified candidate even if that candidate was recruited from a women's college. Exclusion occurs if, for example, the best candidate from the expanded pool fails to get the job because he was passed over for a woman. This can only happen at the selection stage, which occurs after the pool expansion process.

Reopening the application and selection process and recruiting are always neutral with respect to selection if they are inclusive. For this reason, there generally need be no basis for implementing these inclusive procedures. Under some circumstances, however, these affirmative action techniques could act to exclude. This presents an entirely different situation. For instance, if the postsecondary system began recruiting at black and women's colleges and stopped recruiting at Auburn, this would be an instance of exclusion. In order to be truly inclusive, recruiting must be balanced. Similarly, reopening the application and selection process could be merely a pretext to hire someone not in the original pool. A president cannot open up the process for the purpose of selecting or avoiding someone if the action is to remain inclusive.[24] The court has a responsibility to ensure affirmative action techniques that purport to be inclusionary are actually inclusionary. In this instance, the techniques for expanding the applicant pool are inclusionary on their face. There is no suggestion that either reopening the process or conducting affirmative recruitment will cause any harm to qualified applicants other than increased competition. Of course, these techniques could be used as tools of exclusion as applied, which would justify a later attack. The procedures for expanding the pool of applicants contemplated by the decree are inclusive in nature and, therefore, justifiable without resort to traditional Title VII and equal protection analysis.

At least with regard to recruitment, case law compels this result. Perhaps in an indirect recognition of the distinction between inclusion and exclusion, the Eleventh Circuit Court of Appeals stated on two recent occasions that affirmative recruitment is a neutral measure. *Seibels,* 31 F.3d at 1571 (noting "several race-neutral efforts to cure past and present discrimination" including encouraging applications from blacks and waiving application fees and adding that the "decrees themselves required strengthened recruitment of blacks and women"); *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1557–58 (11th Cir.1994) (considering recruitment of minorities and women at high schools and colleges neutral).

The recruiting procedures described in *Seibels* and *Peightal* are not neutral under the ordinary meaning of the term because they take sex and race into account. The Eleventh Circuit thus recognized that race and sex can be taken into account without traditional constitutional and statutory justification, but did not explain its reasoning. The distinction between inclusion and exclusion supplies a likely reason why affirmative recruiting was considered race- and sex-neutral. The recruiting procedures described in *Seibels* and *Peightal* act to include. Whites and men are harmed only by competition from qualified candidates, which is not an appropriate objection. Although labeling recruitment of women and minorities neutral with respect to sex and race is somewhat

---

**24.** This is not to say that opening up the selection process for the purpose of hiring a woman or a minority can never be justified. Such an act of exclusion, however, would require justification under the traditional constitutional and statutory analysis that has been applied to these methods of affirmative action.

misleading, the important point is that inclusive recruitment is readily justifiable. *Seibels* and *Peightal* appear to be using the concept of race and sex neutrality as a substitute for neutrality with respect to selection with its implications of inclusion.

There are two strong public policy arguments behind the implicit rationale in *Seibels* and *Peightal* and the explicit holding here. If employers were not allowed to use recruitment procedures without a showing of discrimination sufficient to meet the traditional requirements of the equal protection clause and Title VII, they would be reluctant to pursue such procedures because they would open themselves up to liability, which might require paying damages. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 290–91, 106 S.Ct. 1842, 1855–56, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring) (noting importance of incentives for voluntary compliance with civil rights laws) (cited with approval in *Seibels*, 31 F.3d at 1566). But recruitment of women and minorities is an excellent way to avoid lawsuits. Reopening the application and selection process is an extension of this principle. If employers rely on inclusive methods, avoiding discrimination problems will not have adverse effects on third parties. Courts should not place obstacles in the way of attempts to comply with the law and avoid discrimination lawsuits unless required to do so by the constitution or by statute. If employers get rid of discriminatory procedures and aggressively recruit minorities and women, more controversial affirmative action measures will rarely be necessary. The law should encourage rather than discourage this development.

The second policy consideration is fostering integration. Society has a strong interest in its diverse members getting along. This interest is furthered by interaction in the workplace. Although bringing about integration through policies of exclusion can be counterproductive, when integration results from inclusion, society achieves a benefit at no cost. Relatedly, employers have an interest in including people from all backgrounds in order to provide better service. Hence, the court cannot agree with the following statement regarding school desegregation:

" 'Racial isolation' itself is not a harm; only state-enforced segregation is." *Missouri v. Jenkins*, —— U.S. ——, ——, 115 S.Ct. 2038, 2065, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring). It is true that "there is no reason to think that black students cannot learn as well when surrounded by members of their own race as when they are in an integrated environment." *Id.* Nor should those who desire, for whatever reasons, to limit private personal exchanges to one race be prohibited from doing so. But to say this is to focus too narrowly. Just because racial isolation does not hamper the ability of blacks to learn or may in some contexts be legal does not mean that there is no harm. As our society drifts more and more into separate racial camps, it cannot be enough simply to say that this is harmless because it is voluntary and uncoerced by the state. Rather, the harm manifests itself in other ways that affect both minority and majority populations. Ignorance, hostility, and misunderstanding are all perpetuated by even voluntary racial isolation in education, housing, and employment. Society has an interest in combating the harms of isolation. And with due respect to private free choice and the ability of each of us proudly to retain his or her varying and rich racial and cultural heritage, the government still has an important role in combating these social harms by encouraging an integrated environment. People of all races, not just blacks, benefit from integration.

### 4. *Employment Goals*

■ The decree sets out employment goals and requires the defendants to make good faith efforts to reach those goals, although the non-attainment of the goals is not a per se violation of the decree. The term "employment goals" can mean many things. For instance, goals can be used for exclusion as a substitute for quotas. Goals can also be used in an inclusive way along with tracking requirements as diagnostic tools. The question is whether employment goals are selection goals that affect the process of selection or diagnostic goals that measure the efficacy of pool expansion techniques such as affirmative recruitment. Employment goals cannot be looked at in the abstract because the

potential for exclusion and adverse effects is generally only present when they are used in the selection process. The aim of the goals is the key to determining whether or not they are appropriate.

Accordingly, this portion of the decree must be read in light of the stipulations reached by the female plaintiffs, defendants, and intervenors. These stipulations clarify that the Johnson decree requires that women "receive equal and non-discriminatory treatment by the Defendants in making employment decisions." It "does not require or permit any preferences for women." Further, not only can no jobs be set aside or reserved for women, but the decree does not permit "the hiring or promotion of less qualified persons on account of their gender or race in order to meet the goals."

The court examines the meaning of the goals in light of these stipulations. The goals certainly are not quotas because jobs cannot be set aside or reserved for women. Another possibility is that the goals are selection goals, which are distinguished from quotas on flexibility grounds. That is, a selection goal might allow some preference for women as long as they were qualified, but would not require choosing unqualified women to fill a rigid number of slots. The goals in the decree, however, do not even rise to the level of selection goals because if there can be no preferences for women and less qualified women cannot be chosen, there is no way for the defendants to meet the goals other than through (1) inclusive, sex-conscious techniques like recruitment and (2) changes to the selection procedures that are not disadvantageous to men being selected for the covered positions other than by increasing competition. Inclusive sex-conscious techniques are acceptable for the reasons already stated. The changes to the selection procedures, aside from the use of recruitment-and-selection committees which is discussed below, are sex-neutral in the strict sense.[25] For example, some changes include advertising all vacancies and justifying employment

decisions in writing. These changes do not make the goals selection goals.

■ In the context of the Johnson decree, the primary purpose of the goals is to measure the effectiveness of the decree's sex-neutral selection procedures and inclusive recruitment. In this respect, the goals are merely diagnostic tools that have no selection force of their own. They do not permit sex-conscious selection. The goals have a secondary purpose, which is also diagnostic, of suggesting which positions the recruitment procedures should emphasize. That is, recruitment should focus on the salary schedules in which women are most underrepresented. The use of goals as diagnostic tools for measurement and emphasis is not illegal under the equal protection clause or Title VII because diagnostic goals do not contemplate exclusion.

### 5. Recruitment-and-Selection Committees

■ Finally, the decree provides for a policy requiring the equal participation of women in the personnel selection process. This policy is met through the requirement that the recruitment-and-selection committees, which review recruitment procedures and screen and recommend candidates, have a membership consisting of 50% women. Unlike the rest of the decree, the committees contemplate exclusion. They do so in two analytically distinct ways. First, the screening function of the committees is a technique of exclusion with respect to the selection process for the covered positions. Second, the 50% female requirement acts to exclude with respect to the composition of the committees themselves. Traditional Title VII and equal protection analysis appears necessary. Before proceeding with this analysis, however, the court discusses some reasons why the traditional analysis might not be necessary or appropriate.

First, although the screening function of the committees is an exclusion technique in the selection process for the covered positions, it is not exclusion on the basis of sex.

---

**25.** Although the recruitment-and-selection committees are not sex-neutral, because they are not permitted by the stipulations to engage in sex-conscious selection for the covered positions, their presence does not affect the meaning of the goals.

Selection is by its nature exclusionary, but such exclusion can be discriminatory or non-discriminatory. The distinction between inclusion and exclusion is premised on the harmful discriminatory potential of exclusion and the lack of such potential in inclusion. Exclusion that is non-discriminatory does not cause illegal harm. In this instance, there is no potential for discriminatory exclusion because the stipulations forbid the committees from giving preferences to women. The purpose of the committees is to ensure that the most qualified applicants are presented to the president. Although this process by necessity excludes less qualified candidates, it does not do so on the basis of sex. Non-discriminatory exclusion, which takes place every day, cannot be illegal. If this were the only technique of exclusion, traditional Title VII and equal protection analysis would not be necessary.

The other way in which exclusion is present is the 50% quota itself. This technique of exclusion is more troubling. It should be recognized, however, that the quota does not affect the selection process for positions covered by the consent decree. The exclusion takes place with respect to positions on the committees. Although the committee quota is exclusionary in nature, it also has attributes of inclusion.

The composition of the committees is inclusionary in the sense that there is no tangible harm to third parties. First, there are no special qualifications for serving on the committees. For this reason, requiring that women be represented at the same level as their percentage of the population seems reasonable. There is no reason to think that men are any more qualified to screen applicants and are therefore being adversely affected by the 50% quota. Indeed, from a practical standpoint, traditional Title VII and equal protection analysis, which, as will be explained later, depends heavily on the concept of qualifications, is ill-suited to analyzing the committees. Second, the committee positions are not desirable in and of themselves to the extent that they give an advantage in job opportunities or increase pay. If there is nothing advantageous about serving on the committees, it is hard to see what tangible harm there is in being excluded.

Notwithstanding these thoughts, the court has difficulty concluding that the 50% quota does not require traditional Title VII and equal protection analysis. Discriminatory exclusion is problematic even if the harmful effects are intangible. In fact, Title VII specifically states that "privileges of employment" are covered. 42 U.S.C.A. § 2000e–2(a) (West 1994). Serving on the committees could be seen as a privilege. Therefore, the court will apply traditional Title VII and equal protection analysis.

B. *Legality of Sex–Conscious Provisions Based on Traditional Title VII and Equal Protection Analysis*

The court relies on the above analysis, based on the distinction between inclusion and exclusion, to find that the decree's sex-conscious provisions other than the quota for recruitment-and-selection committees are legal. The following traditional analysis is necessary only to address the legality of the committees. However, it must be recognized that relying on the distinction between inclusion and exclusion at all is a deviation from general affirmative-action case law. The reason for this is that virtually all, if not all, of these cases concern selection procedures of some sort, generally selection goals or quotas. This opinion does not disregard those precedents, but rather recognizes that precedents developed in the selection-procedure context that focus on exclusion are not applicable to most of the Johnson decree. The Eleventh Circuit has essentially recognized this in its endorsement of affirmative recruitment in *Seibels* and *Peightal.* Nevertheless, to be on the safe side, the court will not limit its traditional analysis of legality to the recruitment-and-selection committees, but will examine the sex-conscious provisions of the decree generally.

■■■ Under a traditional analysis, courts examine sex-conscious provisions under both a constitutional and a statutory standard. As noted earlier, the constitutional standard under the equal protection clause is intermediate scrutiny. Under intermediate scrutiny, "no gender preference can survive unless it is

substantially related to an important government interest." *Seibels*, 31 F.3d at 1580. In essence, the important-interest prong concerns whether relief is justified, and the substantial-relation prong examines the appropriateness of the remedy.

■ The statutory standard for deciding whether sex-conscious relief is permissible under Title VII involves a similar two-part test. First, the court must determine whether sex-conscious provisions are justified by manifest gender imbalances in traditionally segregated job categories. *Johnson*, 480 U.S. at 631, 107 S.Ct. at 1451–52; *In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d at 1537. Second, if there is such a justification, the court must determine whether the remedy embodied in the decree is proper in that it does not unnecessarily trammel the rights of male employees or absolutely bar their advancement. *Johnson*, 480 U.S. at 637–38, 107 S.Ct. at 1455; *In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d at 1537.

The court examines together the justification prongs of the two standards and then turns to the remedy prongs.

### 1. *Justification Prongs*

#### a. *Defining the Title VII Standard*

■ Under Title VII analysis, showing a manifest imbalance entails comparing the percentage of women in the postsecondary system's work force with women in the labor force who possess the necessary qualifications. *Johnson*, 480 U.S. at 631–32, 107 S.Ct. at 1452. As the court has already noted in *Shuford*, it is impossible in this case to develop qualified labor pools because the defendants have not adhered to any objective measure of qualifications. 846 F.Supp. at 1526. The court discussed in depth in *Shuford* why statistical analysis is unnecessary in the context of strict scrutiny under *Croson* if historical and anecdotal evidence presents a sufficient case of discrimination. *Id.* at 1526–27.[26] If this is applicable to strict scrutiny, it

must also be true for Title VII, which is less demanding, even though the Title VII test appears to be formulated solely in terms of statistics. Any other holding would make Title VII more restrictive than strict scrutiny, which is inappropriate. *Johnson*, 480 U.S. at 627 n. 6, 632, 107 S.Ct. at 1449 n. 6, 1452; *Shuford*, 846 F.Supp. at 1520. In this situation, the standard Title VII analysis is inapplicable, and historical and anecdotal evidence can suffice to justify affirmative action.

■ Under the Eleventh Circuit's interpretation of Title VII in the context of a consent decree, a defendant need not declare that it violated discrimination laws but must have a "strong basis in evidence" from which to conclude that it had engaged in discrimination. *In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d at 1539–40. Although a defendant need not make formal findings of its own discrimination, there must be some finding of past discrimination. Thus, it is the court's responsibility to make a factual determination of whether there is a strong basis in evidence of prior discrimination. *Id.*

#### b. *Defining the Intermediate Scrutiny Standard*

■ With regard to intermediate scrutiny, the court must look behind the recitation of a benign purpose to ensure that sex-based classifications redress past discrimination. *See Califano v. Webster*, 430 U.S. 313, 317, 97 S.Ct. 1192, 1194–95, 51 L.Ed.2d 360 (1977) (per curiam). "The principal purpose of intermediate scrutiny . . . is to ensure that gender classifications are based on reasoned analysis rather than archaic stereotypes." *Seibels*, 31 F.3d at 1581. When, as here, it is not alleged that the basis for affirmative action was stereotypes, the question is "whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed." *Id.*; *see also Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982) ("It is readily apparent that a State can evoke a compensa-

---

26. In *Shuford*, the court discussed Title VII together with strict scrutiny. 846 F.Supp. at 1520. Therefore, the lack of necessity for statistical

evidence also applied to Title VII. The court now makes that legal conclusion explicit.

tory purpose to justify an otherwise discriminatory classification only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification"); *Coral Constr. Co. v. King County,* 941 F.2d 910, 932 (9th Cir.1991) ("Some degree of discrimination must have occurred in a particular field before a gender-specific remedy may be instituted in that field"), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992). The discrimination need not be by the defendants, but can be societal in nature. *Seibels,* 31 F.3d at 1580.

To ask whether there is evidence of past discrimination in the relevant economic sphere poses three preliminary questions which must be answered before assessing the evidence. The first question is how to define the correct economic sphere. The second question is how much evidence must be presented to support an important government interest. The third question is what types of evidence are relevant. The court will address these questions and also note any differences with respect to Title VII.

### i. *Relevant Economic Sphere*

 The first question is how to define the relevant economic sphere to be examined for evidence of past discrimination. There are a number of different possibilities. The economic sphere could be defined broadly as all positions in Alabama's postsecondary system. A narrower definition would encompass just the positions covered by the decree: administrative and faculty positions in the postsecondary system. An even narrower definition would require each salary schedule covered by the decree to be its own economic sphere. Finally, an extremely narrow definition would define each college within the postsecondary system as its own economic sphere.

A careful reading of *Seibels* suggests that analyzing each salary schedule or college as a separate economic sphere is unnecessary. The consent decrees in *Seibels* applied affirmative action for blacks and women to all job classifications in the City of Birmingham,

Alabama. 31 F.3d at 1556–57. The Eleventh Circuit found, using strict scrutiny, that the evidence supported a compelling government interest in remedying discrimination against blacks in the police and fire departments. *Id.* at 1567. This evidence, however, did not suffice to justify affirmative action in other departments as required by the decrees. *Id.* In marked contrast, in examining the sex-conscious provisions of the decrees under intermediate scrutiny, the Eleventh Circuit used only evidence regarding the police and fire departments to find an important government interest in remedying discrimination against women employed by the city generally. *See id.* at 1581.

The description of this analysis points out a crucial difference between strict and intermediate scrutiny regarding the particularity of evidence required to show the necessary government interest. Based on the analysis in *Seibels,* it appears that intermediate scrutiny does not require that discrimination be shown in each segment of an entity covered by a consent decree.[27] The narrower economic spheres contemplated above should therefore be rejected. The court also rejects the overly broad definition of all positions in the postsecondary system because the positions covered by the decree should not be justified by evidence regarding uncovered positions. The relevant economic sphere consists of administrative and faculty positions in Alabama's postsecondary system.

There is no indication that Title VII requires a result contrary to this logical conclusion. Thus, the court will look at discrimination in the same positions for both constitutional and statutory analysis.

### ii. *Amount of Evidence Required*

 The second preliminary question is the amount of evidence of past discrimination that must be presented. Under strict scrutiny, a governmental body must have a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson,* 488 U.S. at 500, 109 S.Ct. at 725, 102 L.Ed.2d 854 (1989) (majority opinion) (quot-

---

27. The Ninth Circuit Court of Appeals found facially valid an affirmative action program that included whole industries in which there was no reason to believe women were disadvantaged.

*Associated Gen. Contractors v. City and County of San Francisco,* 813 F.2d 922, 940–42 (9th Cir. 1987) (cited with approval in *Coral Constr.,* 941 F.2d at 932).

ing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986) (plurality opinion)); *accord Seibels*, 31 F.3d at 1565; *Peightal*, 26 F.3d at 1553; *In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d at 1544.[28] Even under strict scrutiny, however, it is unnecessary to find the government entity in question actually liable for past and present discrimination. *Seibels*, 31 F.3d at 1565.

■ The purpose of intermediate scrutiny is to provide a less stringent standard than strict scrutiny.[29] "Logically, a city must be able to rely on less evidence in enacting a gender preference than a racial preference because applying *Croson*'s evidentiary standard to a gender preference would eviscerate the difference between strict and intermediate scrutiny." *Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990, 1010 (3d Cir.1993). Such a lower evidentiary standard could be called "probative evidence." *Id.* Although the Eleventh Circuit in *Seibels* did not address the question directly, it did find an important government interest on the basis of "substantial" evidence of discrimination. 31 F.3d at 1581. Accordingly, the court will require substantial evidence rather than a strong basis in evidence. This is a lower standard than Title VII's strong basis in evidence requirement.

### iii. Relevant Types of Evidence

■ The third preliminary question is what types of evidence are relevant. Under strict scrutiny, the court has looked to historical, anecdotal, and statistical evidence to de-termine whether there is past discrimination. *E.g., Shuford*, 846 F.Supp. at 1522–28. Although the Eleventh Circuit in *Seibels* mentioned only anecdotal and statistical evidence, it did not rule out the use of historical evidence in assessing sex discrimination. 31 F.3d at 1581. The court will therefore look at each of the three types of evidence.

■ As discussed above with respect to Title VII, however, statistical evidence is unnecessary under intermediate scrutiny if historical and anecdotal evidence is sufficient. Although the Eleventh Circuit discussed statistical evidence under intermediate scrutiny in *Seibels*, it made no determination of when such evidence is required. 31 F.3d at 1581. Absent an indication to the contrary, the lack of a statistical evidence requirement under strict scrutiny as found in *Shuford* must apply to intermediate scrutiny.

### c. Examining the Evidence

#### i. Historical Evidence

■ Historical evidence is useful in evaluating claims of discrimination. As general background, there is evidence that women in Alabama have historically been subordinated in both the public and private spheres of life.[30] Although the history of discrimination against women in Alabama need not be traced in detail, it is relevant that up until at least the 1960's, "women were handicapped under the law and severely limited in their professional and educational opportunities."[31]

---

**28.** This standard has also been formulated as requiring "a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion). This court has previously considered both definitions in making its government interest inquiry. *E.g., Shuford*, 846 F.Supp. at 1521. In this case, the court discusses only the strong-basis-in-evidence test for three reasons. First, the most recent United States Supreme Court decision on affirmative action mentions *Croson*'s strong-basis-in-evidence test rather than its prima-facie-case formulation. *Adarand*, ____ U.S. at ____, 115 S.Ct. at 2110. Second, the most detailed examination by the Eleventh Circuit of the evidentiary requirements in affirmative action cases does not use the prima-facie-case standard, focusing instead on the strong-basis-in-evidence formulation. *Seibels*, 31 F.3d at 1565–66. Third, the strong-basis-in-evidence test is more easily modified to reflect the lower evidentiary requirement of intermediate scrutiny than is the prima-facie-case standard.

**29.** One court, however, appears to have determined that, although affirmative action for women is evaluated under intermediate scrutiny, there must still be a strong basis in evidence to justify such a program. *Concrete Works v. City & County of Denver*, 36 F.3d 1513, 1519, 1522 (10th Cir.1994), *cert. denied*, ____ U.S. ____, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995).

**30.** Statement of Robert J. Norrell *in* Joint Submission of Evidence, Exhibit 1 at 1.

**31.** *Id.* at 4.

Alabama's postsecondary system mostly began during the mid–1960's.[32] "These were times when women effectively were still excluded from leadership roles and simply were not considered for high administrative positions."[33] Given this situation, the following expert conclusion is not surprising: "There is a long-established pattern of entrenched discrimination against women in Alabama's Post–Secondary system, where women are systematically assigned to less powerful positions and less important policymaking positions than men are." Additionally, "gender stereotypes of long standing are perpetuated in hiring and promotion practices," which "is manifested by the disproportionately few women who hold key decision-making posts in the System's institutions."[34]

The expert who formed this conclusion found little improvement over time in the proportion of high level administrators in the postsecondary system who are women.[35] This expert also found that from 1965 to 1990 those women who did obtain high level administrative jobs were concentrated in a small number of positions, while men occupied many positions.[36] The positions that women generally held lacked much discretionary authority.[37] These jobs prevent women from gaining the broad administrative experience that is typically thought necessary for advancement.[38] This limited historical evidence has some significance in showing that there has been discrimination against women in the postsecondary system over time.

### ii. *Anecdotal Evidence*

The next question is how this history of discrimination has manifested itself in recent individual cases. "In most class actions alleging employment discrimination, a vital part of the plaintiffs' case is evidence that individual class members, particularly the named plaintiffs, were illegally discriminated against in various facets of the employment process." *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983). Sex discrimination appears to have manifested itself in the postsecondary system in various ways. The court begins by examining the well-developed claims of named plaintiffs Johnson and Newton. The court then turns to anecdotal evidence from many different sources that suggest that women are discriminated against in hiring, duties, and salaries. The pieces of anecdotal evidence related below are merely examples and do not comprise the total evidence in the record. These allegations are not proof, but they are considerations to be weighed.[39]

### (1). *Dr. Connie Johnson*

Johnson is an employee of the Lauderdale County School System.[40] She has an educational doctorate from the University of Alabama in secondary education with an emphasis in vocational education.[41] She alleges discrimination in two separate applications to Muscle Shoals State Technical College for president and dean of instruction.[42] When Johnson applied for the president's position in 1987, she was originally rejected, but then was told that all interested applicants would be given interviews upon request. Johnson claims that this was just a courtesy interview in which no relevant questions were asked and that someone had already been selected.[43] She asserts that she received a rejec-

---

**32.** *Id.* at 3–4.

**33.** *Id.* at 4; *see also* Deposition of Victor Poole *in* Joint Submission of Evidence, Exhibit 91 at 77–78.

**34.** Statement of Mary E. Guy *in* Joint Submission of Evidence, Exhibit 2 at 2.

**35.** *Id.* at 2.

**36.** *Id.* at 2–3.

**37.** *Id.* at 3.

**38.** *Id.* at 3–7.

**39.** Because the court has determined that the relevant economic sphere is administrative and faculty positions in the postsecondary educational system (schedules A through D), the anecdotal evidence need not be broken down by salary schedule.

**40.** Johnson Dep. *in* Joint Submission of Supplemental Evidence, Exhibit 5 at 6.

**41.** *Id.* at 73–74.

**42.** *Id.* at 10–11.

**43.** *Id.* at 30–40, 122–25.

tion letter the day after the interview.[44] Johnson contends she was better qualified than the man selected for the presidency because of her background in vocational education.[45]

Johnson applied for the position of dean of instruction at Muscle Shoals in 1988. Once again, she contends that a less qualified man was hired.[46] Johnson was chosen as one of the three finalists for the position.[47] She claims that Randy Parker was originally rejected because he did not meet the minimum requirements and then was added back in by the president of the college.[48] She further asserts that the president of the college manipulated the process to hire Parker.[49]

### (2). *Dr. Karen Newton*

Newton has worked at Northwest Alabama Community College since 1986 in a variety of administrative positions.[50] She received her doctorate in 1989.[51] Newton bases her sex-discrimination claim on a number of incidents. She claims she retracted her application for business manager at Northwest in 1987 when the president told her that the position would not be at the dean's level, would not be to her advantage, and would pay only about $36,000, which was comparable to what she was then making. After she withdrew her application, a man was hired for the position at $50,000. That man currently outranks her in the hierarchy.[52]

Newton also alleges that she was demoted because of her sex during a restructuring.[53] In 1990, Newton was appointed dean of students at Northwest.[54] This college had a campus at Phil Campbell and a campus at Hamilton.[55] Newton reported directly to the president of Northwest.[56] During a restructuring in 1993, Newton was assigned for a brief period of time to be dean of instruction and student services at Phil Campbell.[57] During that time, the second-in-command at Phil Campbell, who outranked Newton, was a man with a bachelor's degree.[58] Her counterpart at Hamilton was Dr. Sonny Nix.[59] Her assistant for instruction at Phil Campbell was Olan Burcham.[60] During a subsequent restructuring approximately three months later, Newton expressed a desire to be considered for provost of either Phil Campbell or Hamilton.[61] Nix was named provost of Hamilton.[62] Burcham, her assistant, was named interim provost and dean of instruction at Phil Campbell despite not having the educational qualifications for the dean position.[63] Newton was named dean of student services at Hamilton. For policy decisions, she reports to the dean of students at Bevill State Community College, who has not completed his doctorate.[64] Newton is no longer a member of the administrative council as she had been as dean of students at Northwest; in fact, she is the only schedule B employee at Hamilton not a member of the

44. *Id.* at 119–20.

45. *Id.* at 125–26.

46. *Id.* at 135–36, 237–38, 240–42.

47. *Id.* at 229–30.

48. *Id.* at 49–50, 53, 250–54.

49. *Id.* at 248–49.

50. Newton Dep. *in* Joint Submission of Supplemental Evidence, Exhibit 2 at 27–47.

51. *Id.* at 17.

52. *Id.* at 192–96.

53. *Id.* at 124–48.

54. *Id.* at 48.

55. *Id.* at 51.

56. *Id.* at 125.

57. *Id.* at 79.

58. *Id.* at 223–24.

59. *Id.*

60. *Id.* at 106–07.

61. *Id.* at 122–23.

62. *Id.* at 108.

63. Larry Wyman McCoy Dep. *in* Joint Submission of Evidence, Exhibit 85 at 123.

64. Newton Dep. *in* Joint Submission of Supplemental Evidence, Exhibit 2 at 125, 165–67; Dr. Clyde Nix Dep. *in* Joint Submission of Evidence,

council.[65] She further contends that her authority and responsibility have been diminished.[66]

### (3). *Other Anecdotal Evidence*

In addition to Johnson and Newton's experiences, there is other evidence suggesting that women are discriminated against in a number of different ways. The court focuses on evidence that men have been hired over more qualified women, that degree requirements have been applied inconsistently to the detriment of women, that women have not been assigned proper responsibilities and titles, and that women are paid lower salaries than are men.

Most basically, there is anecdotal evidence in the record that less qualified men have been hired over more qualified women. There is evidence that on three separate occasions at two different colleges, a less qualified man was hired over a more qualified female applicant;[67] that a female employee at Lawson State was qualified for certain jobs, but was passed over in favor of men with no experience or qualifications;[68] and that a woman applicant for dean of instruction at Bevill State was the choice of the screening committee and the staff, but was not chosen by the president because he preferred to hire a man.[69]

There is also evidence in the record of the inconsistent application of degree requirements. One of the reasons given that a woman was not qualified for president of Southern Union was that she did not have a doctorate.[70] Yet the male president of Southern Union was appointed despite the lack of a doctorate.[71] Likewise, no questions were raised about Seth Hammett's lack of a doctorate when he was appointed president of L.B. Wallace Junior College.[72] A similar inconsistency appears with regard to deans. Lack of a doctorate was given as a reason that women were not appointed to deanships at one college.[73] The president of Southern Union, however, appointed a male candidate to be vice president of the Opelika campus because the man's greater experience was thought to outweigh the female candidate's greater educational qualifications.[74]

The record contains evidence that women have not been placed in positions of responsibility or given titles commensurate with their duties. The president of MacArthur State considered promoting a woman director to a dean's position, but did not, commenting "she's been perfectly happy with her progress and where she is, and I haven't felt the motivation to go ahead."[75] The female dean of evening division at Northeast Community College remains on schedule C1 because there are not enough slots on schedule B.[76] One female director of public information was also assigned the duties and title of director of admissions, but remained on the same C1 schedule.[77]

Aside from these core issues of hiring, the record contains evidence that women are paid at lower rates than are men. Myra

Exhibit 86 at 86; Harold Wade Dep. *in* Joint Submission of Evidence, Exhibit 96 at 83.

65. Newton Dep. *in* Joint Submission of Supplemental Evidence, Exhibit 2 at 132–37; Nix Dep. *in* Joint Submission of Evidence, Exhibit 86 at 53–54.

66. Newton Dep. *in* Joint Submission of Supplemental Evidence, Exhibit 2 at 126–27.

67. Dr. Gladys King Burns Aff. *in* Joint Submission of Evidence, Exhibit 17, ¶¶ 5–6.

68. Janice Orange Aff. filed on June 17, 1994, ¶ 7.

69. Dr. Deloris Mae Meyer Aff. *in* Joint Submission of Evidence, Exhibit 45, ¶¶ 12, 15.

70. Richard Federinko Dep. *in* Joint Submission of Evidence, Exhibit 75 at 27–29.

71. Steadman Shealy Dep. *in* Joint Submission of Evidence, Exhibit 92 at 35.

72. Hammett Dep. *in* Joint Submission of Evidence, Exhibit 79 at 33.

73. James C. Bailey Dep. *in* Joint Submission of Evidence, Exhibit 64 at 67–68.

74. Roy W. Johnson, Jr. Dep. *in* Joint Submission of Evidence, Exhibit 82 at 36–38.

75. Raymond Chisum Dep. *in* Joint Submission of Evidence, Exhibit 72 at 28–29.

76. Charles M. Pendley Dep. *in* Joint Submission of Evidence, Exhibit 90 at 30.

77. Dr. James Cornell Dep. *in* Joint Submission of Evidence, Exhibit 74 at 70–72.

Davis asserts that women at Lawson State are discriminated against in that men are placed on higher salary scales and receive faster promotions.[78] Another female employee at Lawson State also claims that women are offered lower pay for performing the same jobs as men.[79] Additionally, there is evidence that men who are in charge of branch campuses are paid higher salaries than are similarly situated women. At Gadsden State, the male campus directors are on schedule B, but the female center director is on schedule C1.[80] The male administrator of the branch campus at Fort Rucker is on the C1 schedule.[81] The female director of the adult education facility at Craig Air Base, however, is on the C3 schedule.[82] Further, two women in charge of Alabama Southern's branch campuses are paid on the D schedule.[83] Finally, the female head of the Carrollton Branch only has a part-time contract.[84]

Although statistical evidence is, in many ways, more probative of whether women as a group are being discriminated against, statistics are based on individual instances such as those discussed above. Anecdotal evidence also highlights that discrimination has significance beyond the alleged discriminatory acts because an employee's position influences future advancement. For instance, Dr. Susan Parker alleges that after she applied for the position of dean at Calhoun State Community College, the position announcement was rewritten to require applicants to have held the title of dean. The president of the college then told Parker she was not qualified for the position. In Parker's opinion, the president manipulated the job search to hire a male candidate.[85] Such manipulation would be discrimination in itself. But even without manipulation, previous experience requirements can adversely affect women's future employment because of prior discrimination in the positions considered to be prerequisites.[86]

In sum, the anecdotal evidence is probative of individual discrimination. Further, the anecdotal evidence together with the historical evidence provides the substantial evidence necessary to justify a remedy under intermediate scrutiny and the strong basis in evidence required under Title VII. Nevertheless, there is still statistical evidence available.

### iii. *Statistical Evidence*

The court begins its statistical analysis with some trepidation. One researcher noted, "no chart or figure can do justice to the intangible, invisible, unavoidable network of male-dominance that still exists in too many facets of this state's two-year college system." [87] Nevertheless, the court will proceed with the best analysis possible under the circumstances.

The parties to the decree have presented various statistics of female employment levels in the covered positions. In the analysis that follows, the court relies on personnel statistics for the 1993–94 winter quarter in determining the postsecondary work force.[88]

---

78. Davis Dep. *in* Joint Submission of Evidence, Exhibit 32 at 95–99, 103–10, 112–14.

79. Janice Orange Aff. filed on June 17, 1994, ¶ 8.

80. Victor B. Ficker Dep. *in* Joint Submission of Evidence, Exhibit 76 at 49–56.

81. Joseph Talmadge Dep. *in* Joint Submission of Evidence, Exhibit 93 at 33.

82. Julius Brown Dep. *in* Joint Submission of Evidence, Exhibit 68 at 35–36.

83. John A. Johnson Dep. *in* Joint Submission of Evidence, Exhibit 81 at 37–38.

84. Harold Wade Dep. *in* Joint Submission of Evidence, Exhibit 96 at 25–26.

85. Parker Aff. *in* Joint Submission of Evidence, Exhibit 48, ¶¶ 5–6.

86. *E.g.,* Richard Federinko Dep. *in* Joint Submission of Evidence, Exhibit 75 at 28 (woman presidential candidate hampered because lacked dean experience); Willie J. Paul Dep. *in* Joint Submission of Evidence, Exhibit 89 at 58 (president "next step" after dean).

87. Sara Lou Connell, *Women Administrators in the Alabama Two–Year College System* 92 (1991) (unpublished Ph.D dissertation, Auburn University) *in* Joint Submission of Evidence, Exhibit 3.

88. These statistics are found in Johnson Exhibit 17 and Evidentiary Submission of Moncrief and Davis, Exhibit 17. Joint Submission of Evidence, Exhibit 63 contains similar figures with some slight discrepancies. For purposes of con-

These work force figures cannot be compared to qualified labor pools because such data is unavailable. Nevertheless, there are two types of statistical analysis that are helpful to determining whether there has been discrimination against women.

### (1). *"Less Qualified" Analysis*

The first method of analysis examines discrimination against women by looking at the educational attainment of employees in the covered positions to ascertain whether men are being favored over women. For the purposes of this analysis, the degree attained is used to measure qualifications. It is true that the court previously held that educational attainment cannot be used as a proxy for the qualified labor pool because the defendants have not adhered to minimum educational requirements for the covered positions. *Shuford*, 846 F.Supp. at 1526. The lack of minimum qualifications for the covered positions, however, should not obscure that education is important to obtaining any job in the postsecondary system. Thus, although educational attainment cannot serve as an absolute measure of qualifications, educational attainment can still serve as a measure of relative qualifications. Because educational attainment is the only available data, the court uses it as a reasonable measure of qualifications. *See Peightal*, 26 F.3d at 1555 (unavailability of relevant data not bar to use of available data for statistical analysis).

The following table illustrates the degree dispersion for salary schedules A through C:

| Schedule | Doctorate | Master | Bachelor | Up to Associate |
|----------|-----------|--------|----------|-----------------|
| A | 27 | 10 | | |
| B | 55 | 55 | 18 | 4 |
| C1 | 28 | 60 | 22 | 5 |
| C2 | 5 | 46 | 16 | 7 |
| C3 | 13 | 126 | 113 | 79 89 |

sistency in making comparisons, the court must choose one set of figures. Because the first two exhibits contain more information than the third exhibit, the court will rely on those exhibits.

89. Johnson Exhibit 17.

90. *Id.*

There are 2,168 schedule D employees—too many to count the degree dispersion. It appears that the greatest number of schedule D employees have master degrees and that there are also substantial numbers with doctoral and bachelor degrees. There are only 193 schedule D employees with educational attainment at the associate degree level or lower.[90]

For each of the schedules, there is a group of employees that can be labeled as "less qualified" than the others in terms of educational attainment. The less qualified designation is used relative to the degree dispersion for each schedule. That designation is not meant to imply that those employees are unqualified, only that, compared to other employees in a particular schedule, they are relatively less qualified as measured by educational attainment.[91] For schedules A and B, the less qualified employees are those without a doctorate. For schedules C1 and C2, the less qualified employees are those without master or doctoral degrees. For schedules C3 and D, the less qualified employees are those with no more than associate degrees. The following table shows the number of employees for each schedule and how many of that number fall within the definition of less qualified.

| Schedule | # Employees | # Less Qualified |
|----------|-------------|------------------|
| A | 37 | 10 |
| B | 132 | 77 |
| C1 | 115 | 27 |
| C2 | 74 | 23 |
| C3 | 331 | 79 |
| D | 2168 | 193 |

Breaking down this data by sex illustrates that men are more likely than women to be in the less qualified group.

91. Although the relevant economic sphere is all administrative and faculty positions, that does not prevent aggregating evidence taken from separate salary schedules to show discrimination in the relevant economic sphere. Because the relevant economic sphere is all of the schedules together, however, such disaggregation is not required.

| Schedule | # Men | # Men Less Qualified | # Women | # Women Less Qualified |
|---|---|---|---|---|
| A | 32 | 10 | 5 | 0 |
| B | 106 | 63 | 26 | 14 |
| C1 | 65 | 18 | 50 | 9 |
| C2 | 42 | 14 | 32 | 9 |
| C3 | 155 | 46 | 176 | 33 |
| D | 1089 | 151 | 1079 | 42 |

Of course, absolute numbers are inaccurate because more men than women are employed in most of the salary schedules. The best way to examine these figures is to compare the percentage of women and men who are less qualified. The percentages in the following table are derived by dividing the number of men less qualified by the total number of men for each schedule and doing the same for women.

| Schedule | % Men Less Qualified | % Women Less Qualified |
|---|---|---|
| A | 31 | 0 |
| B | 59 | 54 |
| C1 | 28 | 18 |
| C2 | 33 | 28 |
| C3 | 30 | 19 |
| D | 14 | 4 |

For every salary schedule, a greater percentage of men than women is less qualified. Although it is possible that there is another explanation for these results, it is likely that the discrepancy shows that men are being favored in the relevant economic sphere. That is, men who are less qualified are being given a greater break than similarly situated women. In a discretionary hiring system, this translates into evidence of discrimination against women.

### (2). *Labor Pool Analysis*

The Supreme Court in *Croson* held that a statistical comparison between the employer's work force and the composition of the relevant labor pool is probative of a pattern of discrimination. 488 U.S. at 501–02, 109 S.Ct. at 725–26 (majority opinion). The second statistical test compares women in the work force with women in the relevant labor pool. This test is available only under intermediate scrutiny because its focus on societal discrimination allows the use of a labor pool other than a qualified labor pool as the following analysis will show.

▮▮▮▮▮ Under strict scrutiny, if special qualifications are required, the relevant labor pool contains only those who are qualified.

*Id.* Under intermediate scrutiny, however, qualified labor pools should not be used. It is important to recall that in the context of race discrimination and strict scrutiny, courts look to past discrimination by the defendant entity. *E.g., Shuford,* 846 F.Supp. at 1521. For this reason, courts define a qualified labor pool rather than use the racial composition of the local population because when jobs require particular skills, "the relevant statistical population must be refined to screen for the effects of mere societal discrimination in access to training and skills." *Peightal,* 26 F.3d at 1554 n. 12. Under intermediate scrutiny, the court need not look at the defendant's past discrimination, but can examine societal discrimination in the relevant economic sphere. *Seibels,* 31 F.3d at 1580. This difference makes it inappropriate to screen out societal discrimination in conducting a statistical inquiry under intermediate scrutiny. Because women make up 50% of the population and because women are not inherently less qualified than men for the positions covered by the decree, it stands to reason that the relevant labor pool is 50% female.

It is true that societal discrimination not arising from the relevant economic sphere probably should be screened out. This is a difficult task. To the extent society sent or sends a message to women that it is inappropriate to seek an administrative or faculty position, this societal discrimination is cognizable under intermediate scrutiny. It is probably impossible to disaggregate the effects of such societal discrimination in the relevant economic sphere from general societal discrimination against women. Fortunately, this lawsuit involves the field of education where women have traditionally been overrepresented. For instance, 79% of the certified local school personnel in Alabama for the 1993–94 school year were women.[92] During each of 1989–90, 1990–91, and 1991–92, women were granted 58 or 59% of the doctoral degrees, 76 or 77% of the master

**92.** Johnson Exhibit 13.

degrees, and 78 or 79% of the bachelor degrees conferred by institutions of higher education in the United States in the field of education.[93] Based on these statistics, the court is confident that the 50% female figure does not overestimate the relevant labor pool absent societal discrimination in the relevant economic sphere.

The postsecondary work force, therefore, must be compared to a 50% female labor pool. The total number of people employed in schedules A through D is 2,857, of whom 1,368 are women.[94] Because the labor pool is 50% female, the expected number of women in the 2,857 covered positions is 1,428.5. Comparing the relevant labor pool and the work force essentially requires comparing this expected number of female employees to the actual number.

The Supreme Court has approved measuring the statistical disparity between the work force and the relevant labor pool in standard deviations. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–08 & n. 14, 97 S.Ct. 2736, 2741–42 & n. 14, 53 L.Ed.2d 768 (1977). Standard deviation analysis measures predicted fluctuations from the expected value to determine whether the actual differences are likely to be random. *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). As a general rule, a disparity greater than two or three standard deviations establishes a prima facie case of discrimination. *Id.* at 496 & n. 17, 97 S.Ct. at 1281 & n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood,* 433 U.S. at 307–08 & n. 14, 97 S.Ct. at 2741–42 & n. 14. Although statistics are not to be given "talismanic significance," the Eleventh Circuit recently affirmed in an affirmative action case the general requirement that the difference between the expected number of employees and the actual number of employees should be more than two or three standard deviations to constitute a

strong basis in evidence under strict scrutiny. *Peightal,* 26 F.3d at 1556.

In this instance, the number of women in the relevant labor pool compared to the number of women in the work force reveals a difference between the expected and actual number of female employees of over two standard deviations.[95] This means that the court can say with over 95% confidence that the difference between the expected and actual number of women is not due to chance. This is probative of discrimination under intermediate scrutiny.

Together, the historical, anecdotal, and statistical evidence more than shows substantial evidence of past discrimination against women in the relevant economic sphere. Therefore, eradicating discrimination in Alabama's postsecondary educational system meets the important government interest test and justifies the use of sex-conscious remedies. The same evidence, without the labor pool analysis, also provides a strong basis in evidence of past discrimination, which justifies relief under Title VII.

### 2. Remedy Prongs

The court now examines the remedy proposed by the decree under intermediate scrutiny and Title VII.

#### a. Intermediate Scrutiny Analysis

Under intermediate scrutiny, the question is whether the remedy embodied in the decree is substantially related to the goal of eradicating sex discrimination in the postsecondary educational system. Such a goal requires at least that sex-neutral selection procedures be developed because otherwise sex preferences would last indefinitely. *Seibels,* 31 F.3d at 1581. The Eleventh Circuit also suggested that the duration of the remedy is crucial. *Id.* at 1581–82. The court cannot allow "a potentially indefinite cycle of dis-

---

**93.** Johnson Exhibits 7, 8, 15.

**94.** Johnson Exhibit 17; Evidentiary Submission of Moncrief and Davis, Exhibit 17.

**95.** The court reaches this result as follows. The standard deviation is approximately 26.725, which is derived by taking the square root of the product of 2,857 × .5 × .5. The difference be-

tween the expected number of female employees (1,428.5) and the actual number of female employees (1,368) is 60.5. Dividing this difference of 60.5 by the standard deviation of 26.725 results in approximately 2.26, which represents the number of standard deviations between the expected and actual number of women employees.

crimination to continue." *Id.* at 1581. Finally, any selection goals or quotas must be "needed to eradicate lingering effects of discrimination against women." *Id.* at 1582.

■ It is unclear exactly what other factors comprise the substantial relation inquiry. Under strict scrutiny, there are four factors that must be analyzed to decide whether a remedy is narrowly tailored: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066; *accord Seibels,* 31 F.3d at 1569; *Peightal,* 26 F.3d at 1557; *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d at 1545.

Intermediate scrutiny cannot demand as much as strict scrutiny. The court need not determine exactly what intermediate scrutiny requires because, under any definition, the decree is substantially related to the goal of eliminating sex discrimination in the postsecondary system. In light of the discrimination discussed earlier, the remedy is necessary. The remedy is also mild. Most of the relief is sex-neutral in the strict sense. All of the sex-conscious relief is temporary. The only sex-based provision that is not totally flexible is the requirement that the recruitment-and-selection committees be 50% female. As explained earlier, this quota and the other sex-conscious provisions of the decree impose almost no burden on men. *See Shuford,* 846 F.Supp. at 1531. What burden there is on men with regard to selection for the covered positions is in the form of increased competition and non-discrimination. With regard to the composition of the recruitment-and-selection committees, the burden is minimal and acceptable. *See White,* 867 F.Supp. at 1563; *Shuford,* 846 F.Supp. at 1531.

Finally, the court examines for over- and under-inclusiveness the 50% female quota for the recruitment-and-selection committees and, under the assumption that diagnostic goals as opposed to selection goals might still be subject to this test, the employment goals.

Under the substantial relation inquiry "the decrees need not tie gender goals to the proportion of qualified female applicants." *Seibels,* 31 F.3d at 1582. Because the committee positions have no special qualifications, it is reasonable that women are represented at the same level as their percentage of the population. The 50% female diagnostic goals are also reasonable. In fact, based on the evidence in the record, it would be surprising if, absent discrimination, women did not exceed 50% of the covered positions. In any case, the court can modify the goals. There is no question that the remedy embodied in the decree is substantially related to the goal of eradicating sex discrimination.

### b. *Title VII Analysis*

Under Title VII, the decree must be rejected if it unnecessarily trammels the rights of male employees or absolutely bars their advancement. *Johnson,* 480 U.S. at 637–38, 107 S.Ct. at 1455. By its terms, the decree does not absolutely bar men from advancement because they are allowed to compete with everyone else; the only question is whether the decree's provisions unnecessarily trammel the rights of men. *See In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d at 1541 (reaching same conclusion even though not all positions open to competition). This question is closely related to the inquiry under intermediate scrutiny just completed.

■ "There is no precise formula for determining whether an affirmative action plan unnecessarily trammels the rights of non-beneficiaries." *Id.* at 1541. The plan in *Johnson* was approved even though it allowed sex to be taken into account in making selection decisions. *Johnson,* 480 U.S. at 638, 107 S.Ct. at 1455. Because the sex-conscious provisions of the decree before the court are not even as intrusive as the ones approved in *Johnson* and based on the reasoning used under intermediate scrutiny to reach the conclusion that the decree's remedy is substantially related to eradicating sex discrimination, the court has no trouble finding that the decree does not unnecessarily trammel the rights of men.

Based on the above, the decree's sex-conscious provisions survive traditional analysis under both Title VII and the equal protection clause.

### C. Legality of Race–Conscious Provisions

■ The only race-conscious provisions of the Johnson decree that are not duplicative of the provisions of the Shuford decree already approved by the court concern black women. The sub-class of black women is a distinct group, subject to discrimination based on a dual status as blacks and women that neither white women nor black men receive. *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1099 n. 131 (M.D.Ala.1990). But black women are also subject to the same discrimination as all women and all blacks. For the purposes of this opinion, the court does not examine the evidence as it relates to heightened discrimination against black women as a subset of two groups each subject to discrimination. Rather, to the extent black women are discriminated against because they are women, the court relies on the discussion above, which justified the decree's remedial measures for women. To the extent black women are discriminated against because they are African–American, the court must conduct a similar analysis of racial discrimination under the equal protection clause and Title VII.

Under the equal protection clause, the court applies strict scrutiny. The court need not conduct an independent Title VII analysis because strict scrutiny is more demanding than the Title VII standard, and the court concludes that the race-conscious provisions of the decree pass strict scrutiny analysis. *Shuford,* 846 F.Supp. at 1520.

■ The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *Croson,* 488 U.S. at 493, 109 S.Ct. at 721 (plurality opinion). It "also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* Strict scrutiny requires

that racial classifications "be narrowly tailored to further a compelling governmental interest." *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993); *accord Seibels,* 31 F.3d at 1564; *Peightal,* 26 F.3d at 1552; *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d at 1544.

#### 1. Compelling State Interest

Affirmative action jurisprudence makes clear that a state has a compelling interest in remedying its past and present discrimination. *E.g., Paradise,* 480 U.S. at 167, 107 S.Ct. at 1064; *Seibels,* 31 F.3d at 1565; *Peightal,* 26 F.3d at 1552.

As noted earlier, a determination that a state actor has engaged in racial discrimination sufficient to justify remedial measures based on race depends on a finding that the governmental body has a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion) (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849). The postsecondary educational system need not actually be found liable for racial discrimination. *Seibels,* 31 F.3d at 1565.

The court previously found a strong basis in evidence to conclude that there is discrimination in the postsecondary system sufficient to establish a compelling state interest in using race-conscious relief. *Shuford,* 846 F.Supp. at 1528. This finding, which applied to relief for all blacks, must apply to black women to the extent they are discriminated against because of their race. Therefore, the court has no difficulty in reaffirming in the context of the Johnson decree that there is a compelling state interest in remedying racial discrimination in the postsecondary system.

#### 2. Narrowly Tailored

As noted earlier, in a typical strict scrutiny analysis, there are four factors that must be analyzed to decide whether a remedy is narrowly tailored: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the rela-

tionship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066.

■ Whether relief is appropriate to remedying racial discrimination is necessarily a balancing process left to the discretion of the district court within certain limits. *Paradise,* 480 U.S. at 184, 107 S.Ct. at 1073. *See also Fullilove v. Klutznick,* 448 U.S. 448, 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (opinion of Powell, J., concurring). Narrow tailoring, therefore, is a *range* of what is acceptable, not one perfect plan. "The important consideration is not whether the type of race-conscious relief fashioned by the parties is the best, an inherently subjective determination, but whether it comes within a range of acceptable solutions, a much more objective test." *White,* 867 F.Supp. at 1557.

The court previously found in *Shuford* that the remedies applicable to all blacks are narrowly tailored. 846 F.Supp. at 1528–32. This finding likewise applies to the race-based provisions of the Johnson decree that are duplicative of those in the Shuford decree. Therefore, the only question is whether any new race-based measures are narrowly tailored. There are only two non-duplicative race-conscious measures in the Johnson decree.[96] First, the Johnson decree, which extends for almost five years more than the Shuford decree, in effect continues those race-based provisions of the Shuford decree that are also included in the Johnson decree. Second, employment goals for black women are set at half of the goals approved for all blacks in the Shuford decree.

The approximately five-year extension affects the court's analysis of the Shuford decree only with regard to the duration of the relief question of the narrowly tailored test. The most controversial provisions of the Shuford decree regarding goals are not included in the Johnson decree and are unaffected by the extension of time. As to the provisions that do overlap—for instance the 40% black membership on the recruitment-and-selection committees and the recruitment procedures—there is no reason why an extension of approximately five years should cause the court to reconsider its previous holding that the relief is sufficiently temporary. The Shuford decree already allowed for an extension, and the Johnson decree can be modified or dissolved prior to its termination. Thus, the time extension is not a major alteration and does not change the court's opinion that the race-conscious provisions of the Shuford decree are narrowly tailored.

The next issue is whether the employment goals for black women are narrowly tailored. It must first be recognized that, as the Johnson decree states, the employment goals for black women "do not increase the overall goals set for the class of blacks represented by the Shuford partial consent decree." Instead, the goals for black women are 50% of the overall goals for African–Americans already found to be constitutionally permissible in the Shuford decree. Because the goals for black women do not expand the goals for blacks as a whole, the court's finding with respect to the Shuford decree that the relief is narrowly tailored need not be reconsidered as to necessity, flexibility, or impact on third parties. The sole remaining element of the narrowly tailored test is whether the goals for black women are over- or under-inclusive.

An analysis of over- and under-inclusiveness generally focuses on "the relationship of the numerical goals to the relevant labor market." *Peightal,* 26 F.3d at 1558. This involves determining whether the goals are "reasonably related to the pool of qualified minorities." *Seibels,* 31 F.3d at 1576. As discussed earlier, however, qualified labor pools cannot be determined. The court in *Shuford* used means other than qualified labor pools to find that the goals for all blacks were not over- or under-inclusive. 846 F.Supp. at 1530–31. That foundation remains. The question left is whether allocating half of the overall goals for blacks to black women is justified in light of the rela-

---

**96.** The Johnson decree often refers to measures that must be taken with regard to blacks and women, including black women. The references to black women in this context appear to be merely precautionary. Any reference to blacks or to women must, by necessity, include black women. This type of language does not comprise a non-duplicative race-conscious provision.

tive qualifications of black women and black men.

The record contains data in the form of educational attainment statistics sufficient to answer this question. Once again, the court cannot use educational attainment as a proxy for the qualified labor pool because of the lack of minimum educational requirements. The narrow question before the court, however, is whether black women's qualifications relative to black men support allowing black women half of the goals. Because, as noted above, education is important to obtaining any job in the postsecondary system, degree data is a good measure of relative qualifications. Educational attainment is the only available data; therefore, the court will use it as a measure of the extent to which black women are qualified as compared to black men.

Census data show that black women are better educated than black men in almost every relevant category. Black women comprise 61% of blacks in Alabama with associate degrees, 63% of blacks in Alabama with bachelor degrees, 68% of blacks in Alabama with master degrees, and 32% of blacks in Alabama with doctoral degrees.[97] Data on recent degree recipients suggests that, of blacks currently entering the work force, black women are even more overrepresented compared to black men. During 1989–90, 1990–91, and 1991–92, black women were granted 52 to 54% of the doctorates conferred to blacks by institutions of higher education in the United States.[98] During 1992–93, black women were granted 69% of the doctoral degrees, 78% of the master degrees, 66% of the bachelor degrees, and 74% of the associate degrees conferred to blacks by Alabama institutions.[99]

This data suggests that, if anything, black women comprise over half of the pool of all blacks that are available for employment in the postsecondary system. Therefore, the goals for black women are certainly not over-inclusive. If anything, the goals for black women are slightly underinclusive. The statistics are not precise enough, however, to support invalidating the goals for this reason. The goals for black women are sufficiently narrowly tailored.

Based on the above, the race-conscious provisions of the decree survive Title VII and equal protection analysis.

## V. CONCLUSION

The record shows that the Shuford and Johnson consent decrees provide fully justified institutional reforms that are sorely needed to rectify the effects of discrimination against blacks and women in Alabama. Although the concept of affirmative action is currently undergoing strong attack, it would be unfortunate if the Johnson decree was unthinkingly categorized without a close look at its elements. The decree attempts to eliminate preferences for men that have been built into the employment processes of Alabama's postsecondary educational system. The purpose of the decree is to ensure that women who are right now as qualified and as available as men receive equal treatment. This is a valid, important, and even necessary purpose.

It might appear to some that the court has taken a tortuous route to showing the obvious: that women deserve a fair shot at jobs that they have previously been unfairly denied. Perhaps this is a fair criticism. The evolving jurisprudence of affirmative action, however, demands that the court justify its reasoning through each step of the process. In doing so, the court has arrived at a distinction between affirmative action used for inclusion and exclusion. This distinction, if widely adopted, promises to make it easier to justify some forms of affirmative action in the future.

The court has no doubt that the Johnson decree should be approved. It is fair, adequate, and reasonable, as well as legal. The parties are to be commended for their efforts at ensuring that women in the postsecondary system are afforded the same opportunities as men.

**97.** Declaration of Michele Wilson filed on May 31, 1995 at 20.

**98.** Johnson Exhibits 5, 9, 10.

**99.** Johnson Exhibit 11.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the objections of intervenors Jamie C. Moncrief and Thomas L. Davis to the proposed partial consent decree are overruled as moot;

(2) That all other objections to the proposed partial consent decree are overruled; and

(3) That the joint motion for approval of the proposed partial consent decree, filed by plaintiffs Connie Johnson, Karen Newton, Myra P. Davis, and Sheryl B. Threatt and the defendants on May 2, 1994, is granted.

### APPENDIX

### IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

CIVIL ACTION NO. 89–T–196–N

HUMPHREY L. SHUFORD, individually and on behalf of a class of persons similarly situated, Plaintiff,

CONNIE JOHNSON and KAREN NEWTON, individually and on behalf of a class of persons similarly situated, Plaintiff–Intervenors,

MYRA P. DAVIS and SHERYL B. THREATT, individually and on behalf of a class of persons similarly situated, Plaintiff–Intervenors,

vs.

### ALABAMA STATE BOARD OF EDUCATION, et al., Defendants.

#### *PARTIAL CONSENT DECREE*

1. This action was commenced on February 24, 1989, by Plaintiff HUMPHREY L. SHUFORD. On April 20, 1989, DR. CONNIE JOHNSON filed a motion to intervene. On June 21, 1991, the Court entered an order granting SHUFORD leave to file an amended complaint and granting JOHNSON'S motion to intervene and allowing her complaint in intervention. On September 21, 1993, KAREN NEWTON filed a motion to intervene and a complaint in intervention, which were allowed by the Court on October 19, 1993. On February 3, 1994, MYRA P. DAVIS and SHERYL B. THREATT filed a motion to intervene and a complaint in intervention, which were allowed by the Court on March 2, 1994. This partial consent decree deals only with the claims asserted by JOHNSON, NEWTON, THREATT, and DAVIS and not those asserted by SHUFORD. However, this partial consent decree shall be read in conjunction with and construed contemporaneously with the partial consent decree entered in this matter on March 15, 1994 regarding the claims raised by SHUFORD. (Hereafter called the Shuford partial consent decree).

2. Plaintiff JOHNSON, who is a white female, alleged she was denied a position as President of Muscle Shoals State Technical College and denied a position of dean of instruction at Muscle Shoals State Technical College because of her gender. JOHNSON alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

3. Plaintiff NEWTON, who is a white female, alleged she had been denied promotion to a high administrative position at the Phil Campbell campus of Northwest Shoals Community College and denied a high administrative position at Bevill State Community College. She alleged that she did not receive the position because of her gender and also alleged that she was effectively demoted because of her gender. NEWTON alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

4. Plaintiff DAVIS, who is a black female, alleged she was denied a position of Director of Admissions at Lawson State Community College because of her gender. DAVIS alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1981.

5. Plaintiff THREATT, who is a black female, alleged she was denied a position of Director of Financial Aid at Lawson State Community College because of her gender. THREATT alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1981.

6. Plaintiffs JOHNSON and NEWTON sought to prosecute this case as a class action on behalf of female professional educators who have been or may be victims of gender discrimination in Alabama's community, junior, and technical colleges. Plaintiffs JOHNSON and NEWTON contended, on behalf of themselves and the proposed putative class, that historical circumstances created systematic barriers to equal opportunity in employment for female professional educators throughout said community, junior, and technical colleges. JOHNSON and NEWTON sought appropriate declaratory and injunctive relief for themselves individually and for the respective putative class as a whole.

7. Plaintiffs THREATT and DAVIS sought to prosecute this case as a class action on behalf of black female professional educators who have been or may be victims of racial and gender discrimination in Alabama's community, junior, and technical colleges. Plaintiffs THREATT and DAVIS contended, on behalf of themselves and the proposed putative class, that historical circumstances created systematic barriers to equal opportunity in employment for black female professional educators throughout said community, junior, and technical colleges. THREATT and DAVIS sought appropriate declaratory and injunctive relief for themselves individually and for the respective putative class as a whole.

8. Defendants denied all the material allegations of the amended Shuford complaint, all complaints in intervention, challenged jurisdiction, and asserted various affirmative defenses, including but not limited to res judicata and collateral estoppel.

9. This decree is issued with the consent of the Alabama State Board of Education and Chancellor Fred Gainous, without a trial of any contested issues. The Plaintiff–Intervenors and Defendants have agreed to the entry of this decree to demonstrate their good faith and to avoid the risks, burdens and expense of continued litigation, and to promote full enforcement of federal civil rights laws. The parties have agreed to compromise their claims and defenses on the terms stated herein. It is expressly understood and agreed by the parties that by entering into this consent decree the Defendants are not, and shall not be construed as, in any manner admitting liability; nor do the Defendants admit the material allegations of the complaints in intervention as amended.

10. This Court has in personam and subject matter jurisdiction sufficient to enter this consent decree, and venue is proper.

11. The Court has fully examined the terms of this consent decree and finds them to be reasonable, just, and in accordance with the Fourteenth Amendment to the Constitution of the United States, Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. §§ 1981 and 1983, and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a). Plaintiffs agree to a dismissal with prejudice of the claims asserted under the Voting Rights Act, 42 U.S.C. § 1973.

WHEREFORE, it is hereby ORDERED, ADJUDGED and DECREED, and Defendants Alabama State Board of Education and Chancellor Fred Gainous and their successors are hereby ENJOINED, as follows:

A. Class Certification

1. Plaintiffs JOHNSON and NEWTON represent a plaintiff class defined as follows: "A class of all female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical

colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree." The phrase "positions covered by this decree" as hereinafter used shall be construed accordingly.

2. Plaintiffs DAVIS and THREATT represent a plaintiff sub-class defined as follows: "A sub-class of all black citizens represented by Humphrey Shuford and all women represented by Johnson and Newton, which is further and more specifically defined as a sub-class of all black female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff sub-class and the coverage of this decree." The phrase "positions covered by this decree" as hereinafter used shall be construed accordingly.

## B. Nondiscrimination Policy and Goal of Decree

1. It is the intent of the parties that all junior, technical and community colleges which are or which shall become a part of the Alabama System of Postsecondary Education (referred to hereinafter separately or collectively as the "college" or the "colleges") shall be subject to this decree.

2. Defendants shall adopt the following as a written policy of the Alabama State Board of Education and the System of Postsecondary Education and shall ensure this policy is effectuated in a manner which advances the purpose and goals of the decree so:

a. that no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including without limitation of race or sex and,

b. that all persons participating in selection procedures for professional employees shall take all action necessary to foster black persons and women, including black women, having equal and effective participation in the personnel decision-making process.

3. Defendants shall adopt as a written policy of the State Board of Education that the employment goals stated hereafter shall be employment goals for the appointment of black persons and women, including black women, to positions covered by this decree at State community, junior, and technical colleges; and shall cause the colleges and the Department of Postsecondary Education to implement the Board's policy using their best good-faith efforts, recognizing the spirit and principles underlying the policy. Where particular salary schedules are indicated, the goals stated below shall apply to any equivalent successor salary schedule or schedules which may be established by the State Board of Education. As provided in Section A., it is the parties' intent that this decree include within its coverage all presidential, full-time faculty, and other full-time administrative and supervisory positions regardless of whether the position is shown on the formal A, B, C, or D salary schedule. For purposes of this decree, "full-time" shall mean 35 or more duty hours per week.

Inasmuch as the respective colleges are currently being reviewed in terms of redefining their respective service areas, and inasmuch as their service areas are subject to being revised or eliminated should the State Board of Education deem such revision or elimination to be appropriate, then for the purposes of this consent decree the term "primary service area" shall mean such geographic area as the State Board of Education and Chancellor shall submit to this Court as each respective college's primary service area. The primary service areas designated for the purpose of this consent decree shall not be binding upon any college or the State

Board of Education for any other purposes, unless expressly adopted for such other purpose(s) by the State Board of Education. The State Board and Chancellor shall submit such service area designations to the Court by no later than 120 days after the effective date of this decree. If Plaintiffs contend that the service areas so designated have the purpose or effect of materially thwarting achievement of the employment goals established in this decree, they may file appropriate objections with the Court.

The following employment goals are being established in good faith by the parties to this consent decree with the mutual understanding that the extent to which the respective goals are reasonably attainable shall depend on such factors as the nature and number of vacancies which shall occur during the term of this decree, the number and availability of black persons and women, including black women, who meet the job requirements of the positions in question, and the number of black persons and women, including black women, meeting the job requirements who shall be desirous of applying for the vacancies which shall become available. Therefore, in any instance where any of the following goals is not met, this Court shall reserve the authority to conduct a hearing on the matter of the degree to which the Defendants shall have exercised good faith efforts to reach each such goal. In the event of a finding of a lack of good faith effort on the part of any Defendant, this Court shall order such additional measures as shall be appropriate to ensure that a subsequent reasonable effort is made by the Defendants to reach the unmet goal.

In the event of a finding by this Court with respect to any unmet goal that the Defendants have nevertheless made a reasonable good-faith effort to attain such goal, the Court shall reevaluate such goal to determine whether or not the Court should order that it and related subsequent goals should be modified by the State Board of Education so as to be more reasonably attainable.

### GOALS RELATING TO THE APPOINTMENT OF WOMEN

(1) By the end of Fall Quarter 1996, the total number of female college presidents shall be at least that number which most closely represents twenty-five percent (25%) of all college presidents. By the end of Fall Quarter 1999, the total number of female college presidents shall be at least that number which most closely represents thirty-three percent (33%) of all college presidents. By the end of Fall Quarter 2005, the total number of female college presidents shall be that number which most closely represents fifty percent (50%) of all college presidents.

(2) By the end of Fall Quarter 2005, the percentage of women employed at each college on each of the B, C1, C2, C3 and D Salary Schedules, respectively, shall equal at least that number which most closely represents fifty percent (50%) of the total number of persons employed at each of the respective colleges on the B, C1, C2, C3 and D Salary Schedules.

### GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN

These goals relating to the appointment of black women are to be construed contemporaneously and concurrently with the percentages for appointment of black persons approved in the companion Shuford partial consent decree. That is, the following goals and percentages for appointment of black women are roughly equal to one half of the goals and percentages for blacks as a class represented by Shuford. These goals do not increase the overall goals set for the class of blacks represented by the Shuford partial consent decree.

(1) By the end of Fall Quarter 1996, the total number of black women college presidents shall be at least that number which most closely represents twelve and one half percent (12.5%) of all college presidents.

(2) By the end of Fall Quarter 1996, the percentage of black women employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

(3) By the end of Fall Quarter 1995, the percentage of black women employed on the B and C1 Salary Schedule at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the B and C1 Salary Schedules. By the end of Fall Quarter 1997, this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

(4) By the end of Fall Quarter 1996, the percentage of black women employed at each college on the C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

(5) By the end of Fall Quarter 1995, the percentage of black women employed on the C2 and C3 Salary Schedules at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the C2 and C3 Salary Schedules. By the end of Fall Quarter 1997, this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

(6) By the end of Fall Quarter 1996, the percentage of black women employed at each college on the D Salary Schedule shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

(7) By the end of Fall Quarter 1995, the percentage of black women employed on the D Salary Schedule at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the D Salary Schedule. By the end of Fall Quarter 1997 this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

These goals shall not be deemed to be "quotas" as that term is generally applied, and the nonattainment or over attainment of any of the respective goals shall not be considered to be, per se, a violation of this consent decree. In addition, this decree does not contemplate that any current employee will be terminated, or otherwise adversely affected in his or her employment, in order that progress toward these goals be made; and neither the Defendants nor the colleges shall be required to take such measures. Further, this consent decree shall not be construed to require the Defendants or any of the colleges to hire or promote any person, regardless of race or gender, who is not qualified for the position in question, or to preclude them from hiring or promoting the best qualified applicant regardless of race or gender.

4. The Chancellor, or each of the colleges under the coordination of the Chancellor, shall report to the Court and the parties on or about October 1, 1994 and annually thereafter on or about the same date for the duration of this consent decree, regarding the progress made toward achieving the goals set out above. Any extenuating circumstances or conditions which may have affected a college's progress may be identified in the report, including but not limited to (1) the number and nature of the positions available to be filled during the preceding period, (2) the number of black persons and women, including black women applicants, for the available positions, and (3) an analysis of the college's progress relative to the racial and gender composition of the pool of potential employees who meet the job requirements of the available positions. In any proceedings to review the progress of any college, whether in connection with a motion for further relief or otherwise, nothing in this decree shall foreclose the Defendants or the college from advancing in their defense these or other relevant circumstances and conditions; provided, however, that it shall not be a defense for Defendants or the colleges to rely solely on such extenuating circumstances and conditions. Defendants and the college shall also be required to demonstrate they have taken affirmative measures and made good faith efforts to achieve the goals

of this decree. A college which identifies or relies on such extenuating circumstances or conditions shall include in its annual report, in addition to those items required by Section E. of this decree, the following: (1) the names and addresses of all black persons and women, including black women, who applied for the positions available to be filled during the preceding period, (2) the names and addresses of potential black and female applicants, including black female applicants, for such positions which the college secured, or which were available, from the statewide bank of information maintained by the Chancellor and the Department of Postsecondary Education pursuant to Section C.2.b. of this decree, and (3) a description of Defendants' and the college's efforts to recruit black persons and women, including black women, who applied during the preceding period.

5. In the event a college is (i) meeting or exceeding the goals for that college set out above, or (2) is determined by the Court to have engaged in a concerted good-faith effort to achieve those goals, but the system goals based on all colleges combined have not been met, Plaintiffs shall not apply for, and the Court shall not impose, any further or additional relief against, or which would affect, the college whose goals have been met or pursued in good faith. Such college shall, however, remain subject to the provisions of this decree.

### C. *Practices and Procedures*

1. With the exception of temporary appointments, as provided in Section C.9. below, all vacancies in positions covered by this decree at the colleges shall be filled according to the practices and procedures set out hereinafter.

2. *Recruitment*

a. All employment practices and procedures of the colleges shall be governed by policies promulgated by the State Board of Education, and by any applicable court orders and state and federal statutes.

b. The Board, through the Chancellor of the Department of Postsecondary Education, shall establish and maintain during the term of this decree a centralized recruiting program designed to assist the colleges in making progress toward the employment goals set out above. This program shall include, but not necessarily be limited to, the following activities by the Department: (i) establishment and maintenance of a statewide bank of information regarding potential black applicants and female applicants, for vacancies which may occur at the various colleges; (ii) on a regular basis, but at least annually, recruiting contacts, via letters and/or campus visits, with historically black colleges or universities ("HBCUs"), including but not limited to Alabama A & M University, Alabama State University, Miles College, Stillman College, Talladega College, Tuskegee University, Atlanta University, Fisk University, Florida A & M University, Jackson State University, LeMoyne Owen University, Southern University, and Tennessee State University. These contacts shall advise students and/or existing faculty and staff at the institutions contacted of the availability of positions at the colleges and encourage them to apply for such positions. The Chancellor shall make reasonable efforts to include representatives of the respective colleges in such recruiting visits to the HBCUs, on a rotating or other basis designed to offer the respective HBCUs and the respective colleges broad exposure to one another, and shall encourage the colleges to actively devote their recruiting visits and resources in a manner which fully includes the HBCUs; (iii) on a regular basis, but at least every three months, contacts with Bishop State Community College, Drake State Technical College, Lawson State Community College, and Trenholm State Technical College to obtain the name, address, educational background, previous experience, and area(s) of employment interest of each qualified black applicant, including qualified black women applicants, for employment who is not employed at the respective colleges because of an absence of vacancies in the applicant's area(s) of qualification and interest. The Chancellor shall thereafter cause each such qualified applicant to be contacted to ascertain the applicant's interest in applying for available faculty or staff positions at the various colleges which may have vacancies. If such interest is expressed, the

Chancellor shall advise the presidents of colleges which may have vacancies in the potential applicant's area(s) of qualification and interest; and the president or his/her designee shall thereafter contact those qualified black applicants, including qualified black female applicants, in order to ascertain whether they wish to be considered for employment in an available position; (iv) review, at least bi-annually, of placement lists maintained by the Alabama State Department of Education, the Alabama Education Association, other relevant professional organizations and associations, and the public and private four-year colleges and universities in Alabama; and (v) on at least an annual basis, publication in appropriate professional journals, publications and newspapers, including but not limited to *Black Issues in Higher Education,* the *Chronicle of Higher Education,* and the Alabama Education Association and Alabama Department of Education journals, a statement that the Department and each of the colleges (identified by name and location) are equal opportunity employers and that they are seeking applications in particular from black persons and women, including black women, in order to increase the representation of blacks and women in all professional positions.

c. The president of each college, or the president's designee, shall, in connection with every vacancy which occurs in a faculty or staff position, contact the Department of Postsecondary Education, advise the Department of the nature of the vacancy, and obtain all relevant information available in the Department's information bank regarding potential black and female applicants, including black female applicants, for such vacancy. Accurate records as to the dates of the request for and receipt of such materials shall be maintained as required by Section C.4.b.

d. Each college, on an annual basis and otherwise as vacancies occur, shall advertise all available vacant faculty and staff positions in at least one daily or weekly newspaper published in its service area and in at least one daily newspaper of regional or statewide coverage. These advertisements shall state that the college is an equal opportunity employer and that it is seeking applications in particular from black persons and women, including black women. In addition, each such vacancy shall be reported to the Alabama State Employment Service, and, if feasible, shall be advertised in the Alabama Department of Education journal.

e. One or more representatives of each college shall make annual employment recruiting visits to at least one conference sponsored by: (1) predominantly black institutions of higher education, (2) predominantly black or women's professional associations, or (3) predominantly black or women's industrial organizations.

f. The president of each predominantly white college shall meet on at least an annual basis with black and female community and educational leaders in and around the State of Alabama, and particularly in the college's service area, to discuss the recruitment of qualified black applicants and female applicants, including black female applicants. Accurate records of the date, location, and persons attending said meetings shall be maintained as required by Section C.4.b.

g. In all the college's recruiting contacts required above, the president or the president's designee shall communicate to potential employment sources the policy of nondiscrimination set out in Section B.2.a. above.

3. *Job Descriptions*

a. Prior to the announcement of any vacancy in a faculty or staff position, the college shall develop a complete and accurate job description for the position, which shall contain at least the following:

(1) duties and responsibilities of the job;

(2) required education and work experience;

(3) required license, certification or other credentials; and

(4) all other special qualifications or requirements of the job.

b. Every job description shall be reviewed and appropriate revisions made at least annually by responsible supervisors.

4. *Application Process*

a. When a college has a faculty or staff vacancy, whether in a new position or an existing position, the college shall make every reasonable effort to procure applications from all interested, qualified persons. Each faculty and staff vacancy shall be advertised at the respective college, at the Department of Postsecondary Education, and at each of the other colleges. Vacancy announcements shall specify the salary range for the position to be filled. Vacancy announcements shall be published in time to give all interested persons a reasonable opportunity to respond to them, and they shall describe fully the duties, qualifications and selection criteria for the job. To facilitate distribution of vacancy notices among the colleges and to other interested parties, the Department shall publish and distribute on a regular and frequent basis a jobs newsletter or similar publication, listing job vacancies in a format suitable for posting and distribution at the respective colleges.

b. The following records shall be kept on file at each college concerning each vacancy, vacancy announcement and application received with respect to a position covered by this decree:

(1) all applications for employment, whether solicited or not;

(2) records of all interviews and other contacts with applicants, including a copy of each relevant piece of correspondence with applicants;

(3) a written evaluation of each applicant who met the minimum qualifications for an announced position;

(4) a written record of the response to each announced vacancy, including a list of all qualified persons considered for the vacancy, the name of the person offered the position, and the reasons for the selection;

(5) a copy of each letter, memorandum, report or other communication between college officials regarding the establishment or modification of an employment position, the announcement of a position, the recruitment of personnel, the selection process and the evaluation of applicants.

The aforementioned records shall be maintained for the duration of this decree and thereafter for a period of one year. The records shall be kept in an orderly manner, organized by calendar year and by position.

c. Upon the receipt of applications for a vacancy, applicants who meet the minimum requirements contained in the vacancy announcement shall have their education and experience verified. If verification is obtained, the applicant shall be invited for an interview and, if interviewed, shall be considered for employment; provided, however, that in any situation where the respective college shall receive more than 10 applications from persons who fully meet the announced minimum requirements, the president, in conjunction with the selection committee, shall have the option of conducting a preliminary screening of these applicants in order to determine a reasonable number, but not fewer than 10, to be interviewed. This determination shall be made by reference to Section C.5, below, and taking into consideration the goals and purposes of this decree. All applications, however, shall be maintained as required by Section C.4.b. The finalists, as determined by the pre-screening, shall then each be interviewed. Where feasible, interviews shall be conducted in person. The college, however, shall not be under any obligation to pay the travel expenses of any applicant who is invited for an interview. If the college elects to pay such travel expenses, it shall do so in a manner which is non-discriminatory.

5. *Selection Criteria*

a. Selections of applicants for faculty and staff vacancies shall be based on the following criteria, all of which shall be spelled out in the job description for the vacant position:

(1) minimum education, certification and experience requirements, or a combination thereof, for the position;

(2) additional education, certification and/or experience considered desirable for the position;

(3) evidence of past performance and/or occupational competency that is accompanied

by reliable indicia that it is free of racial or gender-based bias;

(4) any particular needs of students or others who will work with or who may be served by the person selected; and

(5) the particular needs of the college and community it serves for racial, ethnic, cultural and/or gender diversity.

b. In addition, selection shall take into consideration the following criteria, which cannot be spelled out in the job description:

(1) any particular personal qualities and characteristics of any applicant that demonstrably enhance or detract from the applicant's ability to perform the job duties;

(2) the employment goals adopted by the State Board of Education pursuant to Section B.3. hereinabove; and

(3) the best interests of the college, its students, faculty and staff, and the public.

c. Except for the minimum education, experience and certification requirements, the preceding selection criteria shall be applied flexibly and in their totality and shall not be used to create rigid or mathematical measurements.

6. *Recruitment and Selection Committee*

a. Annually each college president shall appoint a recruitment and selection committee which shall make recommendations to the president. Nothing in this decree shall preclude the State Board of Education from adopting a policy regarding the appointment and composition of the committee, provided that such policy is consistent with this decree. The size, composition and membership of the committee shall be determined by the president, but in any event shall include membership which is at least forty percent (40%) black and fifty percent (50%) female. The president in his or her discretion may appoint additional committees from time to time, as need arises, so as to account for different academic disciplines, administrative service areas, or vocational areas in which vacancies may exist, or to enable vacancies to be filled in an efficient and timely manner. Any additional committee so appointed shall have at least forty percent (40%) black and

fifty percent (50%) female membership, but otherwise shall be constituted in a manner determined by the president. No committee shall be appointed or used for the purpose of frustrating the intent of this consent decree.

b. Each member of the principal committee appointed pursuant to this section shall review all recruitment procedures of the college for compliance with the provisions of this decree, and the committee shall file with the president a written report of its findings prior to the expiration of the president's current term of office.

c. Applications for all positions covered by this decree shall be screened by a committee. The committee shall interview the qualified applicants for each vacancy, as determined in accordance with Section C.4., above, and, using the criteria set out in Section C.5., above, shall recommend three applicants to the president (unless there are fewer than three qualified applicants, in which case all qualified applicants shall be submitted to the president). The committee's recommendations shall not be ranked but shall be listed in alphabetical order by last name.

7. *Selection by the President*

a. The president may select one of the applicants for the vacancy recommended by the committee. The president shall not select any person to fill the vacancy (except on a temporary basis, if necessary) except one of the applicants recommended by the committee; provided, however, that if the president deems it necessary to comply with the remedial objectives of this decree, the president may at any time reopen the application and selection process. In filling a vacancy on a temporary basis, the president shall be subject to the requirements of Section C.9.b.

b. The selection by the president from among the candidates recommended by the committee shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

8. *Lateral Internal Transfers and Reorganization of Existing Positions*

a. Notwithstanding the above procedures for filling vacant positions, in the event there

shall be one or more employees at the respective college on permanent status in positions which are at least equivalent to a vacant position in terms of salary schedule and level of responsibility, the president of the college shall have the discretion, in lieu of external solicitation of applicants, to offer all such equivalently positioned employees the opportunity to apply for a lateral transfer to said vacancy. If at least one equivalently positioned black person or woman, including a black woman, applies for the vacancy and the president selects a person who is not black and/or female, the president's decision shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

b. In no instance may the president make such a lateral transfer except where all equivalently positioned employees have been given the opportunity to apply for and to be considered for the lateral transfer without discrimination on the basis of race, color or gender. To enable the president to make a better informed decision consistent with the goals of this decree, no lateral transfer shall be made until the president shall have obtained from the Chancellor the names of potential black and female applicants, including black female applicants, for the position from the statewide bank of information to be established and maintained under this decree. The president of the respective college shall have the discretion, after reviewing all applications for such lateral transfer and any information obtained from the Chancellor, to make the lateral transfer or to open the application process and receive additional applications from all other interested, qualified applicants, with such process to be governed by any applicable provisions of this decree.

c. Recognizing that there may occasionally be situations where, for legitimate reasons not related to race or gender, a college may find it necessary and appropriate to expand or otherwise modify an existing position, the college may do so without the position, as modified, being considered a vacancy subject to the provisions of this decree. Examples of

such circumstances would include expanding the duties of an incumbent employee or reassigning duties among incumbent employees to avoid the necessity of hiring an additional employee; provided, however, that each proposed modification which involves a change of an existing employee's title, salary, placement, benefits, or level of supervisory responsibility shall be subject to the prior written approval of the Chancellor, who shall ensure and document to the Court and counsel for the respective plaintiff classes prior to implementation of the subject modification that the modification is not being made on the basis of race or gender and that the modification is necessary and appropriate given the college's circumstances. No action under this paragraph shall be taken for the purpose of frustrating the intent of this consent decree. Failure of Plaintiffs' counsel to object to a proposed modification under this paragraph at the time notice is given shall not be deemed a waiver of the right to contest said modification at a later date.

9. *Recruitment and Selection of Full-time Temporary Instructional, Administrative, or Professional Employees*

a. In certain limited instances, a college may employ a full-time employee on a "temporary" (as distinguished from "probationary") basis. A "temporary" position generally would be one which is either intended to last for one year or less or has been established for a trial period of one year or less to determine the feasibility of making the position permanent.

b. A temporary position which, if permanent, would be a position covered by this decree may be filled by the president, without compliance with the solicitation, hiring and selection criteria and procedures mandated by this consent decree, including but not limited to use of a recruitment and selection committee, only when one or more of the following conditions exists:

(1) The college is in need of filling such a position for a period of one year or less.

(2) The college is the recipient of a non-renewable contract or grant which is for a period of twelve months or less, and the subject position is established or retained for

the sole purpose of fulfilling the requirements of the contract or grant and will be eliminated upon the expiration of the contract or grant.

(3) The college is in need of immediately filling an unanticipated vacancy and is making a temporary appointment for a period of time in order to properly advertise and accept applications for normal "probationary" appointment to the position. In such instance, the college shall act expeditiously to fill the position on a permanent basis. It is not contemplated that, except in extraordinary circumstances, a temporary employee hired under this provision would remain employed in that capacity beyond the commencement of the academic year next following his or her being hired on a temporary basis.

c. In no instance will a person be allowed to hold a position which would otherwise be a position covered by this decree on a "temporary" basis for longer than twelve months. After that twelve month period, the position shall be filled, if at all, only by an employee selected in compliance with the solicitation, hiring and selection criteria and procedures mandated by this decree. No position shall be left unfilled for the purpose of frustrating the goals and purposes of this decree.

10. *Part-time Employees*

Should a college determine that it is necessary to employ part-time employees, it shall hire and utilize such part-time employees in a manner consistent with, and not calculated to frustrate, the intent of this consent decree. A college shall not engage in the excessive use of part-time employees, and the totality of the circumstances will be considered relating to the college's action.

D. *Reduction in Force Due to Merger or Consolidation*

1. It is currently the position of the Defendants that no merger or consolidation within the System of Postsecondary Education will be accomplished in a manner which will result in the termination or demotion of incumbent employees. In connection with any merger or consolidation which may occur, the Defendants presently intend for all incumbent employees at the affected colleges to retain all rights, privileges and benefits theretofore accruing to them, including but not limited to salary schedule placement, continuing service status (tenure), accrued leave, and date of initial employment.

2. If, in the event of a merger, consolidation or other material restructuring involving one or more of the colleges, it is nevertheless determined that a reduction in force and/or demotions are necessary with respect to employees in positions covered by this decree, the reduction in force or demotions shall be accomplished in a manner consistent with the policy of nondiscrimination and employment goals for black persons and women, including black women, embodied in this decree and the companion Shuford partial consent decree. For purposes of this provision, "demotion" shall mean (1) any material reduction in duties or responsibilities, or (2) any reduction in pay.

3. If it appears to Defendants that a reduction in force or demotions may become necessary as a result of a proposed merger, consolidation or other material restructuring, Defendants shall promptly advise counsel for the respective Plaintiff classes of this possibility. If a merger, consolidation or restructuring plan is to be implemented which actually includes a reduction in force or demotions, Defendants shall give notice of such plan to counsel for the respective Plaintiff classes and the employees to be terminated, laid off or demoted not later than 90 days prior to the date on which the reduction in force or demotions are to become effective; provided, however, that implementation of the plan shall not be delayed so long as Defendants give the required notice as timely as possible and in good faith.

4. Any employee in good standing who is designated to be terminated, laid off, or demoted as a result of a merger, consolidation or other material restructuring shall be provided information by the college, working through and with the Department and the Chancellor, regarding existing vacancies at the other colleges for which the employee may be qualified. In the event such a vacancy is identified and the employee desires to

apply for it, Defendants and the colleges shall facilitate submission and consideration of the application, and make their best efforts to afford an interview before the employee suffers economic loss with respect to the employee's prior employment. Nothing in this paragraph shall require any college to actually employ an employee who is terminated, laid off or demoted as a result of a merger, consolidation or other material restructuring, but any college may elect to employ such an employee.

5. The name of any black or female employee in good standing who is terminated, laid off or demoted due to a merger, consolidation or other material restructuring, but who is not successful in relocating to another college under the provisions of the preceding paragraph, shall be provided forthwith by the college to the Chancellor. The Chancellor shall maintain the name and relevant information regarding such employee in the statewide bank of information to be established and maintained pursuant to Section C.3.b. of this decree, and shall advise the colleges of the potential availability of such employee in connection with the inquiries regarding potential black and female applicants, including black female applicants, which the colleges are required to make under Section C.3.c. of this decree. Consistent with Section C.3.b. of this decree, the Chancellor shall contact and advise each displaced black or female employee of the availability of positions at the respective colleges for which the employee may be qualified. Notwithstanding any other provision of this consent decree, any displaced black or female employee who meets the minimum qualifications for a vacant position at one of the colleges, shall, upon application for the position, be accorded an interview.

6. In identifying incumbent employees to be terminated, laid off, or demoted as the result of a merger, consolidation or other material restructuring, the following non-racial, gender-neutral, objective criteria (where applicable) shall be employed:

 a. Area or field of teaching or other employment expertise;

 b. Degree(s) earned;

 c. Other education achieved; certificates or diplomas earned;

 d. Teaching experience:

 (i) at the college(s) involved in the restructuring;

 (ii) in the instructional field;

 (iii) in other college(s) within the System of Postsecondary Education;

 (iv) in other higher education; and

 (v) in other schools.

 e. Employment experience:

 (i) at the college(s) involved in the restructuring;

 (ii) in other college(s) within the System of Postsecondary Education;

 (iii) positions held;

 (iv) duties performed;

 (v) in other higher education;

 (vi) in other schools; and

 (vii) in other comparable or relevant employment.

7. Any employee who is terminated or laid off due to a merger, consolidation or other material restructuring shall be afforded the opportunity for reemployment at the college, or its successor institution, if a position for which the employee is qualified becomes available, and if the employee otherwise meets all requirements for employment at the college. Any employee demoted due to a merger, consolidation or other material restructuring shall be afforded the opportunity for promotion to the employee's former rank or status, if a position for which the employee is qualified becomes available and if the employee is otherwise in good standing at the time.

8. To implement the provisions of the preceding paragraph, employees terminated, laid off or demoted shall be given priority for filling a vacancy for which they are qualified, and no such vacancy shall be filled until the displaced employee who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so within a reasonable period of time. An employee who fails to accept such an offer for a position which is equivalent or substantially equivalent to the position held prior to the employ-

ee's displacement shall no longer be entitled to the protection of this and the preceding paragraph.

9. The provisions of this Section D. shall apply only with respect to employees who, at the time of a decision to terminate, lay off or demote, occupy a position covered by this decree.

### E. *Reporting Requirements*

The Chancellor shall file with the Court, or cause to be filed by the presidents of the colleges, on or about October 1, 1994, and annually thereafter on or about the same date for the duration of this consent decree, a report describing fully Defendants' efforts to comply with the provisions of this decree, including without limitation the following information for each college and for the Postsecondary System as a whole:

1. The number and percentage of blacks, whites, and others by gender, salary schedule and by rank, employed in positions covered by this decree:

 (a) as of September 30, 1993;

 (b) as of the effective date of this decree; and

 (c) as of September 30 of the year of the report.

Reports after the first report shall also include all the above information which was contained in the next preceding annual report.

2. The name, race, gender and position filled of every person selected to fill a position covered by this decree during the period covered by the report, indicating whether each vacancy was filled permanently, by lateral transfer or as a full-time temporary position;

3. The name, race and gender of every member of the recruiting and selection committee(s) who was appointed or served during the period covered by the report;

4. The name, race and gender position held of any part-time employees during the period covered by the report.

### F. *Right of Inspection*

Upon submission to the Chancellor and the affected college of written advance notice of not less than 10 working days, counsel for the Plaintiff classes shall have the right to: (1) visit a representative college and inspect and copy the records required by Section C.4.b. above to be maintained at the various colleges; (2) inspect and copy records maintained at the Department of Postsecondary Education required to be maintained under the provisions of this decree, including but not limited to records compiled from appointments of presidential vacancies.

### G. *Individual Relief*

1. Plaintiff–Intervenor Dr. Connie Johnson shall be paid compensatory damages in the amount of Forty–Five Thousand Dollars and 00/100 ($45,000.00). Upon payment of this amount to Plaintiff–Intervenor Johnson, all of her claims for individual relief against all of the Defendants, including but not limited to Defendants Larry W. McCoy and Northwest Shoals Community College (which includes the institution formally known as Muscle Shoals State Technical College) shall be dismissed with prejudice.

2. Plaintiff–Intervenor Johnson shall assume individual responsibility for any tax, social security, or Teachers Retirement System report or contribution which may accrue to or be required from her as a result of this payment of compensatory damages.

3. No further relief is given for the claims for individual relief alleged by Plaintiff–Intervenors Dr. Karen Newton, Ms. Myra Davis and Ms. Sheryl Threatt. These claims for individual relief will be further litigated in the U.S. District Court for the Middle District of Alabama.

### H. *Release from Claims*

Plaintiff–Intervenor JOHNSON agrees that upon the entry of this decree she shall consider the relief stated herein to resolve absolutely and completely any and all claims which she has filed or could have filed in this action as of the effective date of this decree against any of the Defendants or against the State of Alabama, or any official or represen-

tative thereof, including but not limited to Larry McCoy, concerning the respective employment, or any application for employment or any term of condition of employment, at Northwest Shoals Community College (including the former Muscle Shoals State Technical College) or any other college which is among those institutions controlled and administered by the State of Alabama Board of Education.

Upon entry of this decree all Defendants shall be dismissed with prejudice with respect to these claims.

### I. *Attorney's Fees*

Although Defendants do not in any manner admit liability under the Shuford complaint, the Johnson complaint in intervention, the Newton complaint in intervention, the Davis complaint in intervention, the Threatt complaint in intervention, as amended, Defendants acknowledge that, for purposes of an award of attorney's fees pursuant to 42 U.S.C. § 1988, Plaintiff–Intervenors Johnson, Newton, Davis and Threatt, as class representatives, are the prevailing parties and also that Plaintiff–Intervenor Johnson is a prevailing party on her individual claims without any admission of liability by the Defendants. Plaintiff–Intervenors Newton, Davis and Threatt are not prevailing parties on their individual claims and there is no acknowledgement or admission by Defendants of any liability. If the parties are unable to agree upon the amount of fees and expense to be paid to Plaintiff–Intervenors, Plaintiff–Intervenors shall file their request for attorney's fees and expenses not later than thirty (30) days after final approval of this decree.

### J. *Term of Decree and Dismissal of Parties and Claim*

Jurisdiction of this action for such other and further relief or enforcement proceedings as may be appropriate consistent with this decree is hereby retained until December 31, 2005, unless, upon the motion of one or more of the parties or upon the Court's own motion and for good cause shown, it is sooner modified, dissolved or extended by further order of this Court. This decree shall be binding upon the State of Alabama Board of Education and/or any of its successors or assigns. The individual Defendants in their individual capacities are hereby DISMISSED with prejudice, and Plaintiff–Intervenor's claim under the Voting Rights Act, 42 U.S.C. § 1973, is hereby DISMISSED with prejudice.

DONE this 11th day of August, 1995

(s) Myron H. Thompson

UNITED STATES DISTRICT JUDGE

(s) Leslie M. Proll

James U. Blacksher

Leslie M. Proll

Attorneys for Plaintiff–Intervenor Connie Johnson, individually and on behalf of a class of persons similarly situated

(s) Rebecca H. Hunt

Joe R. Whatley, Jr.

Rebecca Hunt

Attorneys for Plaintiff–Intervenor Karen Newton, individually and on behalf of a class of persons similarly situated

(s) Beverly P. Baker

Beverly P. Baker

Richard H. Walston

Attorneys for Plaintiff–Intervenors Myra P. Davis and Sheryl B. Threatt, individually and on behalf of a class of persons similarly situated

(s) Gerald A. Templeton

J. Allen Schreiber

Gerald A. Templeton

J. Mason Davis, Jr.

Attorneys for Defendants Alabama State Board of Education; Fred Gainous, in his capacity as Chancellor of Postsecondary Education Services; John M. Tyson, Steadman Shealy, Betty Fine Collins, Ethel Hall, Willie Paul, Tazewell Shepherd, Victor Poole and Dan Cleckler, in their official capacities as members of the Alabama State Board of Education, Northwest

Shoals Community College; Larry McCoy, in his capacity as President of Northwest Shoals Community College; Bevill State Community College; Harold Wade, in his capacity as President of Bevill State Community College; Lawson State Community College; and Perry W. Ward, in his ca-

pacity as President of Lawson State Community College